Roy D. Keehn, Appellee, v. George Braubach and Walter H. Annenberg, Appellants.

Gen. No. 40,674.

Opinion filed November 26, 1940.

WILSON & MCILVAINE, of Chicago, for appellants; J. F. DAMMANN, K. F. MONTGOMERY and CHARLES W. BOAND, all of Chicago, of counsel.

ALBERT FINK, JOHN H. BISHOP and W. M. KEELEY, all of Chicago, for appellee.

MR. JUSTICE JOHN J. SULLIVAN delivered the opinion of the court.

This is an appeal from a judgment entered upon a jury verdict awarding plaintiff $87,500 damages for injuries resulting from an automobile accident.

The declaration consists of three counts. The first alleges:

"1. That at about one o'clock on the morning of July 13, 1935, at a place about seven miles west of the town of Spearfish in the State of South Dakota, on a public highway which ran in a general easterly and westerly direction and was known as U. S. Number 14, plaintiff was injured through the gross negligence and wilful and wanton misconduct of defendant, George Braubach, while riding in an automobile, which automobile was owned by defendant, Walter H. Annenberg, and which was then being driven by the said George Braubach as the agent and servant of the said Walter H. Annenberg, and plaintiff was then riding

in said automobile upon the invitation of said Walter H. Annenberg.

"2. That the aforesaid gross negligence and wilful and wanton misconduct was this, to-wit: The said George Braubach, notwithstanding plaintiff's protests, drove said automobile in a westerly direction at a speed of about sixty miles per hour along the south half of the main traveled portion of said highway, which traveled portion was about twenty-two feet wide and was covered with gravel or crushed stone, and up and over the summit of a hill, and into collision with a motor vehicle then being driven in an easterly direction along the southerly half of the main traveled portion of said highway; and, as a result of said collision, the automobile in which plaintiff was then riding was overturned, and plaintiff was injured and damaged as hereinafter alleged.

"3. That the Statutes of the State of South Dakota, theretofore duly adopted by the Legislature of the State of South Dakota, included provisions regarding the operation of automobiles upon the public highways of said State as follows:

"'Section 3. *Reckless Driving.* Any person who drives any vehicle upon a highway carelessly and heedlessly in wilful or wanton disregard of rights or safety of others, or without due caution and circumspection and at a speed or a manner so as to endanger or be likely to endanger any person or property, shall be guilty of reckless driving and upon conviction shall be punished as provided in Section 64 of this act.

"'Section 4. *Restrictions as to Speed.* (a) Any person driving a vehicle on a highway shall drive the same at a careful and prudent speed not greater than is reasonable and proper, having due regard to the traffic, surface and width of the highway and of any other conditions then existing, and no person shall drive any vehicle upon a highway at such a speed as to endanger the life, limb or property of any person.

" '(b) Subject to the provisions of subdivision (a) of this section and except in those instances where a lower speed is specified in this act, it shall be prima facie lawful for the driver of a vehicle to drive the same at a speed not exceeding the following, but in any case when such speed would be unsafe it shall not be lawful.

" '4. Fifteen miles an hour in traversing or going around curves or traversing a grade upon a highway when the driver's view is obstructed within a distance of one hundred feet along such highway in the direction in which he is proceeding.

" '8. Forty miles an hour under all other conditions.

" 'It shall be prima facie unlawful for any person to exceed any of the foregoing speed limitations, except as provided in subdivision (c) of this section.' (Subdivision C does not apply to the facts herein alleged.)

" 'SECTION 12. *Meeting of Vehicles.* Driver of vehicles proceeding in opposite directions shall pass each other to the right, each giving to the other at least one-half of the main traveled portion of the roadwas as nearly as possible.'

"4. That the said driving of said automobile by said George Braubach at said time and place was by him consciously done with knowledge by him then held of the said surrounding circumstances and conditions, and plaintiff charges that same was a breach and violation of defendant's duty then existing under said circumstances to care for the safety of the person of plaintiff, and constituted an absence of such care, and constituted a conscious indifference to the consequences probably to result from his said driving of said car.

"5. That plaintiff was then and there and at all times material thereto in the exercise of due care, and did no act or thing in any way contributing to the said collision or to his injuries or damages herein alleged.

"6. That as a proximate result and direct consequence of the aforesaid collision, and of the driving of said automobile in which plaintiff was riding, as herein alleged, plaintiff sustained a compound fracture of his right forearm, which rendered amputation necessary; divers bones of his body were dislocated and broken, divers muscles, . . . bruised and injured; . . . his brain and nervous system were greatly shocked and injured and their functions, impaired, by reason whereof he became sick, sore, lame and disordered, and so remained for a long time, to-wit: from thence hitherto; and has been and will for the balance of his life be sick and disabled, and he has suffered and will in the future continue to suffer great pain and anguish by reason of said injuries, and he has by reason of said injuries expended large sums and amounts of money, and has necessarily incurred and will hereafter incur great liability and indebtedness in his efforts and endeavors to be cured of his said injuries; that he has been unable by reason of said injuries to pursue his usual business, employment and occupation, or manage his affairs, and by reason thereof has lost divers great gains and profits, which he would otherwise have earned, to the damage to the plaintiff in the sum of $250,000.

"Wherefore, plaintiff asks judgment against the defendant, George Braubach, in the sum of $250,000."

The second count alleges that "plaintiff was injured by reason of the gross negligence and wilful and wanton misconduct of defendant, George Braubach, while riding in a certain automobile which was owned by the defendant, Walter H. Annenberg, and which automobile said defendant, Walter H. Annenberg, was then and there driving and operating by his agent and servant, George Braubach, and plaintiff was then riding in said automobile upon the invitation of said Walter H. Annenberg.

"12. Plaintiff here recites and realleges as part of this Second Count of this Complaint the statements and allegations contained and made in paragraphs numbers 2, 3, 4, 5, and 6 of First Count of this complaint as fully and completely as though written at length in this Second Count of this complaint."

The third count alleges that "plaintiff was injured by reason of the gross negligence and wilful and wanton misconduct of defendants, George Braubach and Walter H. Annenberg, while riding in a certain automobile which was owned by said Walter H. Annenberg, and which automobile was then and there being operated and driven by defendant, George Braubach, and which automobile was then and there being operated and driven by defendant, Walter H. Annenberg, by his agent and servant, George Braubach, and plaintiff was then riding in said automobile upon the invitation of said Walter H. Annenberg.

"14. Plaintiff here recites and realleges as part of this Third Count of this complaint the statements and allegations contained and made in paragraphs numbers 2, 3, 4, 5 and 6 of First Count of this complaint as fully and completely as though written at length in this Third Count of this complaint.

"Wherefore, plaintiff asks judgment against the defendants, George Braubach and Walter H. Annenberg, in the sum of $250,000."

On December 6, 1937, each defendant filed an answer to the complaint in which he denies gross negligence and wilful and wanton misconduct, admits that plaintiff was a guest without payment for transportation, and alleges that there was a statute of the State of South Dakota which provided as follows: " 'Everyone is responsible, not only for the result of his wilful acts, but also for an injury to another by his want of ordinary care or skill in the management of his property or person, except, so far as the latter has, wil-

fully or by want of ordinary care, brought the injury upon himself. The extent of liability in such cases is defined by the chapter on compensatory relief. Provided that no person transferred [transported] by the owner or operator of a motor vehicle as his guest without payment for such transportation shall have cause of action for damages against such owner or operator for injury, death or loss, in case of accident, unless such accident shall have been caused by the gross negligence or wilful and wanton misconduct of the owner or operator of such motor vehicle and unless such gross negligence or wilful and wanton misconduct contributed to the injury, death or loss for which the action is brought.' (Section 801 of the Revised Code of South Dakota of the year 1919, as amended.)''

On December 10, 1937, plaintiff filed replies to the answers in which he admits the allegations in reference to the guest statute of the State of South Dakota and denies every allegation in the answers that is inconsistent with those in the complaint. The trial of the cause commenced November 14, 1938. During the trial plaintiff, upon leave of court, was allowed to file an amendment to the replies filed by him, which avers:

''1. That he admits the allegation with reference to the terms and language of the statutes of the State of South Dakota . . . ; but does not admit any claims by defendants as to the meaning or application of said statutes, and plaintiff denies that said statutes have any application to the facts involved in this action.

''2. That he denies that plaintiff was a guest without payment for transportation within the meaning of the statutes of the State of South Dakota at the time and place set forth in the complaint.

''3. That, for amendment of pleadings to conform to proof, plaintiff further states that at the time the automobile came into contact with the truck to which reference is made in the evidence, and immediately prior thereto, the automobile in which plaintiff was

riding was being driven by the defendant, George Braubach, as part of the duties of said George Braubach under his employment by defendant, Walter H. Annenberg, and as the agent and servant of said Walter H. Annenberg; and the said automobile was being so driven for the purpose of transporting plaintiff from the town or city of Bowman in the State of North Dakota, to the ranch of M. L. Annenberg in the State of Wyoming, and to provide such transportation as part of a journey from Chicago to said Annenberg ranch which plaintiff then was making upon request of defendant, Walter H. Annenberg; and the said journey was then being made by plaintiff for the purpose of attending to business and affairs in which defendant, Walter H. Annenberg, was interested and for the purpose of discussing such business and affairs with defendant, Walter H. Annenberg, and with said defendant and M. L. Annenberg, father of said defendant, and in connection with the business interests of the said defendant, Walter H. Annenberg, and as a part of the services rendered and to be rendered by plaintiff to the said defendant, Walter H. Annenberg, under arrangements between plaintiff and said Walter H. Annenberg and M. L. Annenberg, whereby plaintiff was to render such services for an annual compensation.''

Defendants' motion to strike this amendment was denied. At the request of defendants the following special interrogatory was submitted to the jury: ''Was the plaintiff, Roy D. Keehn, riding in the Cadillac as the guest of the defendant, Walter H. Annenberg, without payment for such transportation?'' To this interrogatory the jurors answered, ''No.''

Plaintiff offered evidence to sustain the following theory of fact: On the night of the accident plaintiff, his daughter Kay, then 12½ years old, and his son Kent, then 10 years old, arrived by train at Bowman, North Dakota, at 9:20 o'clock p. m. They were on

their way to the ranch of M. L. Annenberg, situated about 160 miles from Bowman. That station was the ordinary point of departure from the railroad for those who intended to go to the ranch. M. L. Annenberg is the father of Walter H. Annenberg. M. L. Annenberg sent to Bowman two automobiles to take the Keehn party from Bowman to the ranch. The accident occurred in South Dakota, at about 1: 30 a. m., after 140 to 150 miles of the drive to the ranch had been covered. Plaintiff was riding in a Cadillac limousine, which belonged to Walter Annenberg and was driven by Walter's chauffeur, George Braubach, defendant. Kay and Kent were seated in the back seat of the limousine and between them sat Gertrude Boze, M. L. Annenberg's secretary. The other car sent to the station was a Ford. It carried most of the baggage and also two other members of the party, Norman E. Bensinger and Arnold Kruze. The Ford preceded the Cadillac until the party left Spearfish, South Dakota, approximately 135 or 140 miles from Bowman, when it stopped and the Cadillac went on ahead. The route was over a State highway, a gravel road about 22 feet wide. The highway ran east and west. At about the place of the accident the road appeared to have been dragged that morning and the gravel had been moved from the south to the north side of the road, and the dragging left on the south side a smooth surface about 16 feet wide. The dragging had left a ridge of gravel ''about 6 feet from the north side of the road and about six inches high and about a foot at the base.'' As the Cadillac started from Bowman plaintiff had a conversation with Braubach in reference to speed, in which he cautioned Braubach to drive slowly. Braubach said that he would drive around the Ford car and in that way get out of the dust, to which plaintiff responded, ''No, I would prefer if you didn't. Let us drop back and get out of the dust. I haven't driven over country roads

much and we were in an accident last year and I don't
want to drive fast.'' Braubach then slowed down the
speed of the car and did not drive the car fast until
they reached the town of Spearfish. There, as Brau-
bach drove around the Ford car, he speeded up until
the speedometer registered 50 miles an hour. Plain-
tiff then spoke to him again and said he did not want
to drive so fast on that kind of a road and asked Brau-
bach to slow down the speed of the car, and Braubach
said, ''I have driven this road very frequently, know
it thoroughly all the way,'' to which plaintiff replied,
''Well, I am not interested in that. I don't want to
drive on that kind of a road fast and won't you please
quiet down.'' ''My Kay is very nervous. We have
been in accidents,'' to which Braubach replied, ''All
right, Mr. Keehn,'' and he slowed down. Plaintiff
then said to Braubach, ''We are on a vacation and we
are in no hurry.'' Braubach then slowed down to
about 40 miles an hour. Plaintiff then went to sleep,
or dozed. The next thing that he realized was that
the car was rocking and going very fast. He had the
impression that the car speeded over to the opposite
side of the road and turned rapidly. Just about that
instant Kay punched him on the back and called to
him, and he immediately realized that they were going
at a terrific speed. He looked at the speedometer and
saw that it registered about 70 miles per hour. He
called to Braubach, ''What the hell are we doing.''
Plaintiff saw that they were going up one side of a
small hill and as they approached the crest lights came
up from the other side immediately in front of their
car. He saw that they were on the left-hand side of
the road and headed directly toward the other car, a
truck. The Cadillac at that instant was going about
70 miles an hour. ''Almost at that instant —certainly
not more than a second or two until the crash came.''
The lights of the truck were probably 150 feet away
from the Cadillac when he first saw them. The Cadil-

lac hit the truck with "a terrific thud." After the impact the Cadillac went a number of feet further west, then turned to the left and off the highway, jumped a 20-foot ditch, 3 feet deep (Braubach testified it was 5 or 6 feet deep), tore through a barbed wire fence, tearing out two posts, continued on into a pasture, turned around and fell over on its side. The weight of the car was close to 5,000 pounds. It was approximately 800 to 1,000 feet from the eastern foot of the hill to the top of it, which is approximately 20 feet above the regular level of the road. After the impact the Cadillac car "was aflame." Kay testified that just as soon as her father went to sleep Braubach speeded up the car to 70 to 80 miles an hour; that she looked at the speedometer; that Braubach was then driving the Cadillac on the left-hand or wrong side of the road; that she became alarmed and called to her father, and just about that time the lights of the truck appeared over the crest of the hill and the accident happened almost immediately; that there was a glass partition which separated the driver from the rest of the automobile, but that it was not up at the time of the accident. She further testified that she saw the truck approaching when it was 200 feet away from them. Kent testified that Braubach drove the Cadillac slowly until they reached Spearfish, but that when his father went to sleep Braubach speeded the Cadillac up to about 80 miles an hour; that he (Kent) looked at the speedometer; that his sister got nervous and hollered to her father and poked him in the back of the neck; that his father woke up and hollered to Braubach, "and then we saw the lights of the other car and then the crash came"; that when he first saw the lights of the other car they were about half a city block away from the Cadillac, that is, about 300 feet distant; that when he first saw the lights of the truck the Cadillac was on the same side of the road that the truck was on; that he saw the truck at 300 feet. The left-front

fender of the Cadillac was very much damaged and the front axle was bent. The contact "bent the rim of the left rear dual wheel [of the truck] right around back next to the hub. The rim part of the wheel is about six inches wide. It is made of heavy steel and is very resistant against damage. It took an enormous impact to bend that rim in that condition." After the accident splinters from the truck were found in the highway, about four or five feet south from the center of the highway. When the Cadillac turned over plaintiff's right arm was pinioned under it. Four minutes after the accident Bensinger and Kruze, driving the second car, arrived on the scene. The fire was then put out and all of the men tried to lift the Cadillac in order to free plaintiff's arm, but they were unable to move the car. They then got fence posts and pried the car up about a foot, but it was with great difficulty that they were able to get plaintiff out of the car. Jack Ford, the driver of the truck, testified that he was traveling east on the south side of the road, about 20 to 24 inches from the south boundary of the road; that "traveling up the west slope of the hill I was going about 25 miles an hour in third gear"; that the Cadillac was over the hill before he saw its headlights; that when he first saw the headlights it looked to him as though they were about 150 feet ahead; that the moment he saw the headlights he made a slight turn to the right as much as he could and then straightened out; that the Cadillac was going from 60 to 70 miles an hour, and hit the left-front corner of the box part of the truck back of the front wheels and the driver's cab; that it tore off some splinters but did no serious damage.

On cross-examination of the witness it developed that he had been indicted, tried and convicted of the offense of grand larceny and had served a term in the penitentiary for that offense. When the witness was first asked about the conviction he positively denied that he had ever been convicted, but after he had

been examined at length on the subject he admitted the conviction. The witness further testified, upon cross-examination, that while he was going 25 miles an hour the Cadillac, between the time he first saw it and the impact, traveled 90 feet while he traveled 60 feet. The next day the witness took the stand and upon direct examination by plaintiff's counsel testified that between the time he first saw the Cadillac and the impact he could not have traveled over 20 feet. The cross-examination of Ford further developed that the witness had made an affidavit, in October, 1937, in which he stated that at the time of the accident the Cadillac was being driven at a speed of at least 50 miles an hour. As a result of the accident, plaintiff lost his right hand and forearm and was otherwise seriously injured.

For the defense, Braubach testified that he had driven automobiles for 21 years; that he had been in the employ of Walter Annenberg for two years and prior to that time had been employed by the Cadillac Motor Company for a period of 12 years; that he was a driver of great experience and a finished automobile mechanic. He denied that plaintiff had talked to him in reference to the speed of the car, and stated that he did not hear plaintiff's daughter say anything to plaintiff just prior to the impact; that there was a glass partition between the front and rear seats of the Cadillac and it was up before and at the time of the accident, and they could not have talked to one another because the glass partition was up. He further testified that he was proceeding west on the right-hand side of the road at a speed of about 35 miles an hour when the accident occurred; that the crest of the hill was about 30 feet above the level road to the east with a gradual approach of about 800 to 1,000 feet; that he saw no reflection from the lights of the truck as he approached the top of the hill; that he first saw the lights as he got to the crest of the hill; that when he first saw the truck it was not over a couple of feet away; that the lights of the truck,

as he first saw them, indicated that the truck was a little bit across the center line of the road; that the truck seemed to swerve to its right; that it all happened so fast that it was just a minute or a second until they hit; that he tried to apply his brakes; that after the impact he "went down the road a ways and turned to the left, crossed the ditch into a field"; that on a dry pavement he could stop the Cadillac car "going at the rate of 40 miles per hour somewhere within 30 feet; at 35 miles an hour, within 24 and 26 feet"; that he knew the highway "was the main traveled road in that section of the country from the east to Yellowstone Park. There was not a considerable amount of traffic on it at night"; that he did not meet nor pass any automobiles from the time he left Bowman until the accident occurred. Miss Boze testified that just before the collision she observed the speed of the Cadillac and that it was traveling approximately 35 miles an hour at the time; that the Cadillac was then on the right-hand side of the road; that she did not hear either of plaintiff's children shout out just before the accident; that she was carrying on a conversation with them; that the speed of the Cadillac between Bowman and the place of the accident never exceeded 50 miles an hour.

It was conceded that plaintiff received an annual retainer of $20,000, for which he was to render legel services for M. L. Annenberg, Walter Annenberg, members of the Annenberg family, and the corporations that they own. Plaintiff testified that for several months he had been working on a number of legal matters for M. L. Annenberg and Walter Annenberg; that in May and June, 1935, some of these matters had not been completed and that the Annenbergs had asked him to come to the ranch and discuss these matters and several other matters in which Walter was interested; that he was on his way to the ranch for the purpose of taking care of these legal matters and not for the purpose of a vacation. Defendants testified that

they had invited plaintiff to come to the ranch for a vacation, and not for the purpose of performing any work. The jury, as we have heretofore stated, in response to the special interrogatory, answered that plaintiff was not riding as a guest of the defendant Walter H. Annenberg without payment for such transportation. However, as each of the counts of the complaint alleges that "plaintiff was injured through the gross negligence and wilful and wanton misconduct of defendant, George Braubach," and ordinary or general negligence is not alleged in any of the counts, plaintiff was obliged to prove gross negligence and wilful and wanton misconduct by Braubach, and plaintiff's counsel, upon the oral arguments in this court, admitted that plaintiff, under the allegations of the complaint, assumed that burden. On the trial of the case plaintiff assumed the burden of proving that Braubach was guilty of gross negligence and wilful and wanton misconduct. In view of the special finding of the jury, if plaintiff, by apt pleadings, had alleged ordinary or general negligence, proof to sustain that kind of negligence would have been sufficient. As defendants, by their answers, asserted that the guest statute of South Dakota applied to the facts in the case, and plaintiff by his reply alleged that he was not a guest within the meaning of the statute, it is difficult for us to understand why the able and experienced counsel for plaintiff did not file additional pleadings that would have allowed a recovery if the evidence showed that he was not a guest at the time of the accident, that Braubach was guilty of ordinary or general negligence and that plaintiff was not guilty of contributory negligence.

At the close of all the evidence defendants made a motion for a directed verdict for defendants. They now contend that the trial court erred in refusing to allow this motion. As the accident occurred in South Dakota the laws of that State determine the substan-

tive rights and obligations of the parties. Defendants contend that the Supreme Court of South Dakota has determined the rights and limitations of parties in a personal injury case where the charge is that the injuries resulted from gross negligence and wilful and wanton misconduct, and that under the rule laid down by that court the evidence in the instant case, taken in the light most favorable to plaintiff, is not sufficient to go to the jury on the charge of gross negligence and wilful and wanton misconduct as alleged in the complaint, and, therefore, the court should have directed a verdict for defendants. The leading case cited by defendants is *Melby v. Anderson*, 64 S. D. 249. There the court interpreted the words, ''gross negligence or wilful and wanton misconduct of the owner or operator of such motor vehicle,'' in the guest statute of South Dakota. That statute follows the guest statute of Michigan. The South Dakota court, after calling attention to decisions by the Supreme Court of Michigan bearing upon the guest statute of that State, states (pp. 252, 253):

''A fair statement of the net result of these Michigan cases construing this statute prior to our adoption thereof seems to us about as follows: That 'gross negligence,' as used in the statute, is really a misnomer, and that the conduct described by those words transcends negligence and is different in kind and amounts to willful, wanton, or reckless misconduct as distinguished from negligence even though spoken of as gross negligence. Its characteristic is willfulness rather than inadvertence. That there is no such thing as 'gross negligence' in the sense of great or much negligence, and the term as implied in the statutes does not mean something of a less degree than willful or wanton misconduct. That to create liability under the statute there must be (1) knowledge of a situation requiring the exercise of ordinary care and diligence to avert injury to another; (2) ability to avoid the resulting

harm by ordinary care and diligence in the use of the means at hand; (3) omission to use such care and diligence to avert the threatened danger when, to the ordinary mind, it must be apparent that the result is likely to prove disastrous to another.'' The court further states (p. 254): ''We conclude, therefore, as follows: This statute was taken from the law of Michigan, and will be construed and interpreted in the light of the Michigan decisions relating to it before our Legislature adopted it. Under those decisions, the words 'gross negligence' are, for practical purposes, substantially synonymous with the phrase 'wilful and wanton misconduct.' Willful and wanton misconduct (and gross negligence as it is employed in this statute) means something more than negligence. They describe conduct which transcends negligence and is different in kind and characteristics. They describe conduct which partakes to some appreciable extent, though not entirely, of the nature of a deliberate and intentional wrong. To bring the conduct of the defendant within the prohibition of this statute the jury must find as a fact that defendant intentionally did something in the operation of a motor vehicle which he should not have done or intentionally failed to do something which he should have done under such circumstances that it can be said that he consciously realized that his conduct would in all probability (as distinguished from possibly) produce the precise result which it did produce and would bring harm to the plaintiff.''

In passing upon a motion for a directed verdict certain well-established rules must be observed. In *Synwolt v. Klank*, 296 Ill. App. 79, 87, this Court said: ''The rules which should govern a trial court in passing upon a motion to direct a verdict are well established. In *Hunter v. Troup*, 315 Ill. 293, the court said at pp. 296, 297: 'A motion to instruct the jury to find for the defendant is in the nature of a demurrer to the evidence, and the rule is that the

evidence so demurred to, in its aspect most favorable to the plaintiff, together with all reasonable inferences arising therefrom, must be taken most strongly in favor of the plaintiff. The evidence is not weighed, and all contradictory evidence or explanatory circumstances must be rejected. The question presented on such motion is whether there is any evidence fairly tending to prove the plaintiff's declaration. In reviewing the action of the court of which complaint is made we do not weigh the evidence,—we can look only at that which is favorable to appellant. *Yess v. Yess,* 255 Ill. 414; *McCune v. Reynolds,* 288 id. 188; *Lloyd v. Rush,* 273 id. 489.' '' See, also, *Mahan v. Richardson,* 284 Ill. App. 493, 495; *Wolever v. Curtiss Candy Co.,* 293 Ill. App. 586, 597; *Thomason v. Chicago Motor Coach Co.,* 292 Ill. App. 104, 111.

Following the foregoing rule, we find evidence adduced by plaintiff tending to support the following facts: That defendant Braubach was an experienced chauffeur and familiar with the national highway in question; that he refused to obey the urgent appeals of plaintiff to drive slowly; that the trip from the ranch to the railroad station and from the railroad station to the place of the accident had kept him out the greater part of the night, and he was determined, apparently, to reach the ranch as soon as possible; that the Cadillac was being driven at a terrific and highly dangerous rate of speed at the time of the impact; that Braubach was then on the wrong side of the road, in a path allowed by the law to vehicles approaching from the other direction; that he knew as he approached the crest of the hill he was likely to meet a motor vehicle coming up the hill from the west; that the jury had a right to infer that Braubach in his haste to reach the ranch, was willing to take chances and ''that he consciously realized that his conduct would in all probability (as distinguished from possibly) produce the precise result which it did produce and would bring

harm to the plaintiff.'' We refuse to hold that under the ruling of the South Dakota court in the *Melby* case the trial court erred in refusing to direct a verdict for defendants.

Defendants contend that the finding of the jury that Braubach was guilty of gross negligence and wilful and wanton misconduct was contrary to the manifest weight of the evidence. While we are unable to agree with this contention, nevertheless, the case, upon the evidence and the law as laid down in the *Melby* case, was manifestly not one-sided upon the question as to whether or not the conduct of defendant Braubach at the time and place in question constituted ''gross negligence or wilful and wanton misconduct.'' That there is testimony upon that question that would be sufficient to sustain a verdict for either party is, in our opinion, evident. In such a state of the record it is the settled law of this State that it was essential to a fair trial that the issues should be determined by an impartial jury, solely upon the evidence in the case, without any appeal to passion or prejudice, and the record should be substantially free from prejudicial error. This brings us to an important contention of defendants:

Defendants contend that throughout the trial counsel for plaintiff was guilty of improper and highly prejudicial conduct and that the trial court upon a number of occasions failed to sustain proper objections of defendants to such conduct. Numerous acts of counsel for plaintiff are referred to in connection with the instant contention. We will take up the more important ones: Over the objections of defendants plaintiff was allowed to testify that the two Annenbergs owned the Miami Beach Tribune, New York Telegraph, General News Bureau, Radio Guide, Cecilia Corporation, Nation Wide News Bureau, Daily Racing Form, circulation agencies, newspaper and magazine circulation agencies in various cities, and were engaged in extensive real estate operations; that the activities of the Annenbergs were nation-wide. While counsel for defendants

had stated to the court that defendants made no issue as to the $20,000 retainer, the court, in admitting the foregoing testimony, stated that such evidence would ordinarily not be competent in a case like the instant one, but that he was admitting it as evidence tending to show that a $20,000 retainer was not out of place or extraordinary. As bearing upon the nature of his journey to the ranch, plaintiff had the right to show, in a reasonable way, that his duties as attorney for the Annenbergs frequently involved the consideration of important matters, but we think that the trial court allowed too great latitude in the proof in this regard and that the evidence tended to prejudice the jury in their consideration of the case, especially in view of the fact that plaintiff was allowed to give testimony tending to show that he was in a bad financial condition after the accident. Twice in his closing argument plaintiff's lawyer called the Annenbergs "Captains of industry." In arguing that the jury should believe the testimony of plaintiff that he went to the ranch on business, counsel for plaintiff said: "Well, now you know when you are (of course you don't because you are not a lawyer) but I am going to do a little testifying, and I am going to tell you that when a lawyer represents these captains of industry on an annual retainer of $20,000 a year, even the best and the highest up lawyers nowadays take particular care that they do not offend their employer in any way. Now there was a time, as your Honor knows, when law was a profession and we lawyers when we had a captain of industry for a client had him come to our office. Now, if you please, that angle has changed considerably. In many cases (I have seen it in New York) where a captain of industry pushes a bell, if you please, and in walks a lawyer, and a pretty high up lawyer in the profession.

"I don't say that General Keehn was in that class either, but I am just saying that to illustrate the probability that Keehn yielded and went up there because

he felt to a certain extent that he could not afford to go contrary to the expressed desire of both Mr. Annenberg and Walter.'' Counsel for defendants moved the court to withdraw a juror and declare a mistrial because of these statements, but the motion was overruled.

During the direct examination of plaintiff the following occurred: ''I had my children with me, which made a definite impression on my mind that they were going to lose me and I didn't know what the future meant for them. I realized if I didn't die I was probably going to be crippled for life and lose my business and position in the National Guard. How much of that was due to sickness I can't tell but I was in terrible distress and worried all the time I was in Passavant and afterwards.

''Q. Did you have sufficient resources at that time to meet the expenses that were accruing?

''Mr. Montgomery [attorney for defendants]: I object.

''The Court: Objection sustained.

''Mr. Montgomery: The court sustained the objection.

''Mr. Fink [attorney for plaintiff]: Sir?

''The Court: Objection sustained.

''Mr. Fink: Q. Was your own financial condition one of the causes of your mental worry and anxiety, combined with the physical pain and suffering and your inability to carry on on that account?

''Mr. Montgomery: I object.

''The Court: Objection sustained.

''Mr. Fink: Q. You stated, did you not, General, that one of your causes of worry and mental pain and anxiety and suffering was the feeling that you were not able to carry on and conserve your business?

''A. That is right.

''Q. Did you have any pressing business matters at that very time that required your own personal immediate attention?

"Mr. Montgomery: I object.

"The Court: He may answer.

"The Witness: A. I don't know what pressing business matters are. All of my business.

"Mr. Fink: Q. Well, did you have any particular ones that you can recall now?

"A. I don't recall them specifically. Different matters that I was working on.

"Q. Well, your down town real estate, for instance?

"A. That was.

"Mr. Montgomery: I don't think counsel should suggest to the witness.

"The Witness: A. I thought he meant legal work, legal business. My own personal business distressed me a great deal.

"Mr. Fink: Q. Yes?

"A. Because of the condition I was in and the realization that I had that I was probably through.

"Mr. Montgomery: I move that be stricken.

"The Court: Yes, that may go out.

"Mr. Fink: Q. What about the encampment of the 33rd Division?" In spite of the court's final ruling that this evidence should not be considered by the jury, we are of the opinion that the evidence seriously prejudiced the rights of defendants. On the one hand, defendants were held up to the jury as men of great wealth and power; and, on the other hand plaintiff was held up to the jury as in financial difficulties, which greatly worried him. The purpose of both of these lines of evidence is obvious. These lines of inquiry and argument were clearly calculated to prejudice the minds of the jurors against defendants.

Defendants next call our attention to certain statements made by counsel for plaintiff in his closing argument. It appears from the evidence that during the winter after the accident M. L. Annenberg saw plaintiff in Florida and visited with him. Counsel for plaintiff, in his closing argument, said: "And what do you know was going on between General Keehn and Mr. Annen-

berg after Keehn got down there in Florida and maybe long after that, as to this lawsuit, and whether or not there were any discussions as to whether or not a righteous and just settlement could not be effected without having to go to law? The fact is you don't know anything about it; but these gentlemen do.

"Mr. Montgomery: I object to this argument.

"The Court: The jury will disregard it.

"Mr. Fink: To what part of it, that they know nothing—

"The Court: Nothing in this evidence concerning that subject matter. It is best left alone.

"Mr. Fink: Very well." Thereupon the following proceedings occurred in chambers:

"Mr. Montgomery: For the purpose of the record I would like to make a motion because of Mr. Fink's remark relative to settlement, bringing in something that was not in the case at all because of the probable prejudicial effect, I would like to make a motion for the record to withdraw a juror and declare a mistrial.

"The Court: The motion will be denied." There was not a word of evidence in the record to justify the statement of plaintiff's counsel. The statement was highly prejudicial to defendants and no one knew better than counsel for plaintiff the effect that his statement would, in all probability, have upon the jury. The motion of defendants to withdraw a juror and declare a mistrial should have been allowed by the trial court.

Defendants next complain of the conduct of counsel for plaintiff during the cross-examination of plaintiff's witness, Ford. Ford was an important witness for plaintiff. The cross-examiner was asking questions as to whether Ford had been indicted for grand larceny and had been convicted of that offense, and had served a term in the penitentiary. This being a civil case the fact of the conviction may be proved like any fact not of record, either by the witness himself, who shall be

compelled to testify thereto, or by any other witness cognizant of such conviction, as impeaching testimony, or by any other competent evidence. (*Bailey v. Beall*, 251 Ill. 577, 585.) During the cross-examination Ford testified, positively, that he had never been convicted of a crime and had never served any time in a penitentiary. The cross-examination had proceeded to a point where it was apparent that counsel for defendants had evidence to show that Ford had been indicted for grand larceny, convicted of that offense, and had served a term in the penitentiary, whereupon counsel for plaintiff exclaimed, "Haven't you got through torturing him enough?" to which statement counsel for defendants objected. Thereupon counsel for plaintiff stated: "His wife is sitting out here. You are entitled to show he was convicted. You have got your record of conviction and I withdrew my objection to it." At the convening of court the following morning the following proceedings were had, out of the presence of the jury:

"Mr. Montgomery: Before the jury is brought in I would like to complete my record. What Mr. Fink said here that I was torturing the witness. I objected and there was no ruling on that. He said that the witness's wife was in the courtroom calling the jurors' attention to that which was a fact that I did not know, I objected to that and the court did not rule on it. I move you instruct the jury to disregard Mr. Fink's comments in that regard. Secondly, the person who I am told was his wife was sitting in the back of the room and started crying just as the jurors filed out and they all walked right by her. That exhibition I think the Court should direct the jury to disregard.

"Mr. Fink: I have no objection.

"The Court: If there is any possibility that the jury got any glimpse of her or the fact that she was crying the Court is very willing to instruct the jury on the subject.

"Mr. Montgomery: I don't know whether the person who was pointed out to me as his wife is his wife. The jury did look at her as they were going out.

"Mr. Fink: Well that was the way she was weeping and I saw her myself." Whereupon, the following proceedings were had in the presence of the jury in open court: "The Court: . . .

"Anything that may have transpired in the courtroom yesterday if it came at all to your observation should be entirely overlooked and disregarded by you and not permitted in one iota to affect your judgment in this case. Your judgment ultimately will have to rest entirely upon the evidence as you hear it here from the witness stand and the instructions of the Court which will be given you in writing. Does that cover the subject?

"Mr. Montgomery: I think it does." During the closing argument counsel for plaintiff severely criticized counsel for defendants for his cross-examination of Ford; argued that counsel for plaintiff had entrapped Ford into lying on the subject of his conviction; intimated that if plaintiff's counsel were placed in the position of Ford and the latter's wife were in the courtroom, he would have lied as Ford did. Plaintiff's counsel also intimated that if he had been in Ford's position he would have lied as Ford did. In view of Mr. Fink's conduct it is quite likely that the jury must have regarded Ford as a hero and defendants' counsel as a merciless lawyer who would entrap and crucify a witness and cause the latter's wife to suffer. It is conceded that Ford's wife started weeping as the jurors filed out and that they all walked by her. The cross-examination of Ford was proper and in accordance with the law. It is idle to argue that defendants were not seriously prejudiced by the actions of Ford's wife.

Other complaints are made by defendants as to the conduct of plaintiff's counsel, but it would unduly

lengthen this already long opinion to discuss them. We are satisfied that the instant contention of defendants, that counsel for plaintiff was guilty of such improper and prejudicial conduct throughout the trial as to deprive them of a fair trial, is a meritorious one. Where the record shows, as it does in this case, that an attorney has deliberately and repeatedly indulged in prejudicial argument to the jury and in other prejudicial conduct, the effect of such misconduct cannot be measured, and the only remedy is to grant a new trial. (*Mattice v. Klawans*, 312 Ill. 299.)

Defendants contend that they were seriously prejudiced by the action of the trial court in giving to the jury, at the instance of plaintiff, instruction numbers two and three. We think this contention is a meritorious one. Instruction number two directed a verdict for plaintiff, and defendants make a number of just criticisms of the instruction. The instruction tells the jury that if they find from the evidence that Braubach violated statutes of the State of South Dakota relating to driving upon the highways of that State, and that if they further believe from the evidence that such driving of the car by Braubach "was gross negligence and wanton and wilful misconduct as defined in other instructions given to you . . . then your verdict will be for the plaintiff." In our opinion the instruction should have given the definition of "gross negligence and wanton and wilful misconduct" as defined by the South Dakota court in the *Melby* case. The jurors reading this mandatory instruction were likely to conclude that if Braubach "was guilty of violating the statutes of the State of South Dakota relating to driving upon the highways of that state," their verdict should be for plaintiff. No instruction given at the request of plaintiff defined "gross negligence and wanton and wilful misconduct." One instruction given at the request of defendants did give the definition of

the words as defined by the Supreme Court of South Dakota, but in view of the many instructions given to the jury at the request of both parties it is very doubtful if the jury in reading the mandatory instruction would refer to all of the instructions to find a definition of the words in question. The proper place to have given a definition of the said words was in the mandatory instruction. We agree with defendants that instruction number two was very likely to cause the jury to conclude that mere violations of the statutes of South Dakota relating to driving upon the highways of that State constituted gross negligence and wilful and wanton misconduct. *Granflaten v. Rohde*, 66 S. D. 335, 283 N. W. 153, illustrates how strictly the Supreme Court of South Dakota adheres to the definition of gross negligence and wilful and wanton misconduct as laid down in the *Melby* case. In the *Granflaten* case plaintiff's evidence showed that defendant was driving a number of guests in his car; that he had been driving at a speed between 65 and 70 miles an hour at 10 o'clock at night on a highway where the traffic moving in both directions was very heavy and that he had been frequently passing cars going in the same direction and had passed them on hills and on level places; that his guests had complained frequently, had asked him not to drive so fast, and not to pass cars on hills; that he disregarded their request, and while passing a car on a hill, while he was going at about 65 to 75 miles an hour and on the wrong side of the road he suddenly came in view of another car coming from the opposite direction over the crest of a hill and about a hundred feet away; that a collision followed that caused serious injuries to the guests. Nevertheless, the Supreme Court of South Dakota held that under the rule announced in the *Melby* case plaintiff had not made out a prima facie case. The court held that a mere error of judgment as to the re-

sult of doing an act or the omission of an act, having no evil purpose or intent or consciousness of probable injury, may constitute negligence, but to make the conduct of the driver wilful and wanton the evidence should disclose a conscious realization under the circumstances that injury is a probable (as distinguished from a possible) result of such conduct. As we have heretofore stated, it is difficult for us to understand why plaintiff's counsel did not file pleadings charging defendants with ordinary negligence. Plaintiff's instruction number three is clearly subject to just criticism. The first sentence of the instruction reads: "If you find the defendants guilty, it is your duty to return a verdict against both defendants for damages in an amount to compensate plaintiff for such injuries and loss as you may find plaintiff has sustained as a direct and proximate result of *the acts or negligence* of defendant, Braubach." (Italics ours.) The case went to the jury on the question of liability solely on gross negligence and wilful and wanton misconduct, and this instruction permits the jury to award plaintiff damages that result from "negligence," and even from "acts" of defendant Braubach. Further criticism of this instruction is made by defendants, but we do not deem it necessary to consider the same.

Defendants have not had a fair and impartial trial, and the judgment of the circuit court of Cook county is reversed and the cause remanded for a new trial.

*Judgment reversed and cause remanded for a new trial.*

FRIEND, P. J., and SCANLAN, J., concur.