Raymond A. FLYNN, Trustee of the Estate of Lillian M. Snodderly, Bankrupt, Plaintiff-Appellee,

v.

Nancy Franklin O'DELL, Defendant-Appellant.

No. 12943.

United States Court of Appeals Seventh Circuit.

Aug. 3, 1960.

Frank Millington Ryan, Rockford, Ill., Miss Mary M. Shaw, Chicago, Ill., for appellant.

Charles A. Thomas, Edwin T. Powers, Jr., Rockford, Ill. (Edwin T. Powers, Jr., Rockford, Ill., of counsel), for plaintiff-appellee.

Before HASTINGS, Chief Judge, and KNOCH and CASTLE, Circuit Judges.

KNOCH, Circuit Judge.

Plaintiff, Trustee of the Estate of Lillian M. Snodderly, Bankrupt, brought suit to set aside a conveyance by the bankrupt to her daughter, Nancy Franklin O'Dell, Appellant herein, of one-half interest in real estate, made by Mrs. Snodderly on October 11, 1957, within one year of the filing of her petition in bankruptcy, on or about February 24, 1958, and allegedly without consideration. Although the Trustee brought this action in the District Court, rather than in the State Court, by virtue of his being an officer duly appointed by the United States District Court, he asserts that the action is of an equitable nature based on the substantive law of the State of Illinois governing conveyances of interest in real estate by insolvents, and not on the federal bankruptcy laws.*

The evidence showed that on October 11, 1957, the date of the conveyance, Mrs. Snodderly was indebted to several creditors, listed in the Record of Claims of the bankruptcy proceedings, whom she was allegedly unable to pay, including a debt of $17,000 to the City National Bank of Rockford, Illinois, which, subsequent to the conveyance, obtained a deficiency judgment of $8,123.76.

---

\* Title 11 U.S.C.A. § 110, sub. e(1) [Section 70, sub. e(1) of the Bankruptcy Act] "A transfer made \* \* \* or obligation incurred by a debtor adjudged a bankrupt under this title which, under any Federal or *State* law applicable thereto, is fraudulent \* \* \* shall be null and void as against the trustee of such debtor." (Emphasis added.)

The District Judge, after hearing the evidence, found that the premises in question were originally purchased from funds belonging to Mrs. Snodderly and to Mrs. O'Dell, (then respectively Mrs. Lillian F. Nystrom and Miss Nancy Franklin) the latter having been a minor until October 11, 1957, the date of the conveyance sought to be set aside. The District Judge found that one Ruth E. Rinehart, who took title with Mrs. Snodderly, did so only as an accommodation for the real owners, and had no interest in the premises. He held that Mrs. Snodderly should have scheduled her joint interest in the premises as an asset in the bankruptcy proceedings; that her joint interest was fraudulently concealed from her creditors; that the conveyance without consideration to her daughter was null and void. The conveyance was set aside, and the Trustee was ordered to reduce the joint tenancy to possession for the benefit of Mrs. Snodderly's creditors. This appeal followed.

The action in the Court below was instituted against both Mrs. Snodderly and Mrs. O'Dell, but only Mrs. O'Dell appealed the decision.

Mrs. O'Dell contends that the Trustee failed to prove facts entitling him to the relief sought; that his complaint stated no cause of action; that the District Judge erred in admission of evidence and that his findings did not support the relief granted. Mrs. O'Dell contends that the realty belonged to her, and that Mrs. Snodderly merely held it in trust for Mrs. O'Dell during Mrs. O'Dell's minority.

Mrs. Ruth Rinehart Dagnar testified that she acquired title in her own name (then Ruth Rinehart) on May 17, 1948. She testified that the funds for the purchase price ($10,500) were partially her own and partially those of Mrs. O'Dell (then Nancy Franklin) and other funds secured through loans. Mrs. Dagnar testified further that she had executed a Declaration of Trust stating that she had been entrusted with funds belonging to Nancy Franklin for purchase of the realty, and that said Nancy Franklin was the owner of an undivided half of the property, which was not to be sold without the consent of Nancy Franklin's legal guardian, and that, on attaining her majority, Nancy Franklin was to receive her undivided half interest by deed of conveyance. This Declaration of Trust was recorded November 24, 1958, more than a year after the conveyance by Mrs. Snodderly to Mrs. O'Dell. When asked about the delay in recording, Mrs. Dagnar said she had supposed the Declaration of Trust to have been filed earlier, that it was executed on the date it bore (June 1, 1948).

This Trust would have been ineffective as to creditors without notice, under Illinois law:

"*Effect of recording as to creditors, etc.* All deeds, mortgages and other instruments of writing which are authorized to be recorded, shall take effect and be in force from and after the time of filing the same for record, and not before, as to all creditors and subsequent purchasers, without notice; and all such deeds and title papers shall be adjudged void as to all such creditors and subsequent purchasers, without notice, until the same shall be filed for record." Ill.Rev.Stat.1959, ch. 30, Sec. 29.

Mrs. Dagnar testified further that she contributed half the purchase price; that Nancy Franklin provided $800; that Mrs. Dagnar lived in half the house on the premises, renting the other half and using the rents (half of which were Nancy Franklin's) plus other contributions of Mrs. Dagnar's, to pay the mortgage.

On March 1, 1952, Ruth Rinehart conveyed to Nancy and Mrs. Snodderly as joint tenants. Mrs. Snodderly and Mrs. Dagnar testified that the consideration for this conveyance was about $1700 to compensate Mrs. Dagnar for her interest, her management of the property and the payments she had made on the mortgage. When asked why the revenue stamps on the deed were consistent with a consideration of about $4500, Mrs.

Dagnar said that she did not know why, that she had paid for some of the stamps but not for all of them, and that she had not received $4500. Mrs. Snodderly and Mrs. Dagnar testified that the $1700 was secured by sale of bonds given Mrs. O'Dell by her step-father. Mrs. O'Dell, who married July 21, 1956, while still a minor, moved into part of the premises, renting one apartment, and continued to make payments on the mortgage.

Mrs. Snodderly testified that her name was included in the conveyance of March 1, 1952, only because her daughter was a minor and that it was always intended that conveyance would be made to Mrs. O'Dell when she attained her majority.

James Hornbeck of the American National Bank in Rockford, Illinois, testified to savings accounts in the name of Mrs. Lillian Nystrom (now Mrs. Snodderly) as "trustee for Nancy Jane Nystrom" which had been opened in 1946 and closed in 1949. Mrs. Snodderly testified that on April 3, 1948, she drew out $500 from this account and added it to $300 belonging to her daughter, which had been kept in a safe in a store, to make up the initial down payment. The bonds which produced the $1700 had been purchased by Mrs. Snodderly's then husband, Gus Nystrom, in his own name, but for Nancy's education, and had then been cashed by Mr. Nystrom, to provide the funds to pay Ruth Rinehart.

Mrs. O'Dell testified to her own earnings, after she began to work at the age of fifteen years, out of which she testified she made payments on the mortgage. She said that her mother sometimes made the payments for her, but that such payments were always made out of Mrs. O'Dell's funds. There were some inconsistencies in Mrs. O'Dell's statements about her earnings. For example, she spoke at one point of earning $5,000 in 1958, but later stated her earnings to have been about $47 per week.

Ishmael Harold Franklin, Mrs. O'Dell's father, testified that while he was in the army, for a litle more than a year, about 1945–1946, he had sent allotment checks totaling about $400 to his divorced wife, Mrs. Snodderly, for Nancy.

Mrs. Snodderly also testified to family gifts of money for Nancy which had been deposited in the bank account or kept in the safe at the store.

Charles Summerfield, President of the City National Bank of Rockford, a creditor, testified that, in March, 1956, when applying for a loan, Mrs. Snodderly, in a financial statement, claimed to own the realty in question. Mrs. O'Dell characterizes this as not a very serious claim, made in error, and not relied on by the bank, which allegedly made the loan on the security of other property owned by Mrs. Snodderly. As indicated, the bank subsequently obtained a deficiency judgment.

Mrs. Snodderly also testified to having stated that she was the owner in an application for an improvement loan at the Third Securities Company. She also testified that she had orally told a bank official otherwise, and, further, that the loan had been refused her because search indicated that the title was in both Mrs. Snodderly's and her daughter's name.

Some documents were admitted for impeachment purposes. Mrs. Snodderly had testified that she obtained no property settlement in connection with her divorce from Gus Nystrom. A document embodying a property settlement agreement was admitted into evidence solely for the purpose of impeachment.

Similarly, Mrs. Snodderly denied ever claiming the property as hers. Steven Helfer, an attorney, called in rebuttal by plaintiff, recognized plaintiff's exhibit 10 as a complaint drawn by him, on telephoned instructions from Mrs. Snodderly, in December, 1956, after the improvement loan mentioned above was refused. This document was never executed or filed. It purported to establish that the name of Nancy Franklin in the deed from Ruth Rinehart had been inserted through scrivener's error; and that Nancy Franklin had furnished no part of the consideration for the property. Mr. Helfer had subsequently, in July or

August, 1957, drafted a complaint for Mrs. O'Dell, after he no longer represented Mrs. Snodderly, to "get her mother's name off the paper," (Appellant's Appendix, p. 96) which was never issued because Mrs. Snodderly said "she would rather execute a deed than go through the difficulty of a lawsuit" and she had executed the conveyance of October 11, 1957. The Trial Court ruled that plaintiff's exhibit 10 was admitted for the sole purpose of impeachment.

Mrs. O'Dell contends that the exhibit was improperly admitted; that it does not in fact impeach Mrs. Snodderly's testimony because an unsigned document should not be called a "claim." In any event, Appellant argues that the document was highly prejudicial to her as it purports, on its face, to prove one of the issues, and it may therefore have influenced the Court. Appellant relies on Jones & Adams Co. v. George, 1907, 227 Ill. 64, 71, 81 N.E. 4; United States v. 88 Cases, More or Less, etc., 3 Cir., 1951, 187 F.2d 967, 974, certiorari denied 342 U.S. 861, 72 S.Ct. 88, 96 L.Ed. 648; and Keehn v. Braubach, 1940, 307 Ill.App. 339, 30 N.E.2d 156.

■ All three of these cases were tried before a jury. In the first case, Thomas George sued the Jones and Adams Co. to recover damages for personal injuries sustained while he was working in the Jones mine. Over objection, Mr. George was allowed to prove that he was a married man and had three children. This was recognized as error by the Appellate Court, but apparently it was there considered that a remittitur of $1500 had in some way cured the error. The Illinois Supreme Court concluded (227 Ill. at page 71, 81 N.E. at page 6) that it would be a dangerous precedent to hold that a party could introduce irrelevant testimony which might appeal to the sympathy of the jury in such a way as to ensure a verdict on doubtful questions of fact, and then to permit an estimate of the amount of damages awarded due to the irrelevant testimony where, but for the error, the verdict might have been in favor of the other party.

The second case cited involved a libel charging adulteration of food. The Court of Appeals found the issue to be whether the ordinary consumer would confuse the product in suit (which contained about 6% orange juice, 2% lemon juice, and 87% water) with undiluted orange juice. It was charged that yellow coal tar dyes, sugar, lactic acid and orange oil had been added to make the product appear to be of greater virtue than it actually was. The cause was remanded for error in the instructions. The Court also commented on the nature of some of the proof. Undiluted fresh orange juice contains vitamin C. The product in suit did not. Evidence was introduced of experiments on guinea pigs, six of which were given orange juice, six given the product in suit, and four given another diet lacking vitamin C. Pictures of the last ten, which appeared to have died in agony, were shown to the jury. Evidence was also adduced regarding development of scurvy in children who drank an orange-flavored liquid but received no vitamin C. The Court of Appeals concluded (187 F.2d at page 975) that it could be proved without such sensationalism that orange juice was much more nutritious than the product in suit, and that it was impossible to calculate the effect of such evidence in creating prejudice in the minds of the jurors.

The Keehn case concerned an award of $87,500 for injuries resulting from an automobile accident. The plaintiff, an attorney, was injured while riding in an automobile owned by his client, Walter H. Annenberg, and driven by George Braubach, Mr. Annenberg's chauffeur. Plaintiff alleged that he was riding in the automobile at Mr. Annenberg's invitation for the purpose of attending to business in which Mr. Annenberg was interested. A special interrogatory was given to the jury:

"Was the plaintiff, Roy D. Keehn, riding in the Cadillac as the guest of the defendant, Walter H. Annen-

berg, without payment for such transportation?"

to which the jury said, "No."

It was alleged that the accident, a collision with a truck, occurred through the gross negligence and willful and wanton misconduct of the chauffeur. Ordinary or general negligence was not alleged in any of the counts. The evidence of the witnesses was such that the Illinois Appellate Court thought (307 Ill.App. at page 358, 30 N.E.2d at page 159) that the testimony on "gross negligence or wilful and wanton misconduct" was sufficient to sustain a verdict for either party. Thus it was essential to avoid any appeal to passion or prejudice.

Over objection, plaintiff was allowed to testify to the vast holdings and extensive operations of the Annenbergs. Although defendants had raised no issue as to the retainer, this evidence was purportedly adduced to show that the $20,000 retainer paid plaintiff was not out of place. The Illinois Appellate Court held that plaintiff had a right to show that his duties involved consideration of important matters, but that the undue latitude allowed here tended to prejudice the jury, in view of the fact that plaintiff was also allowed to show his bad financial condition after the accident.

The Appellate Court found numerous prejudicial comments were made by counsel for plaintiff. One incident involved cross-examination of an important witness for plaintiff—Mr. Ford, the driver of the truck with which the automobile had collided, whose testimony attributed the accident solely to the wanton misconduct of the chauffeur. Mr. Ford had stated that he was never convicted of a crime and had never served time in a penitentiary. On further cross-examination, it became apparent that he had been convicted of grand larceny and had served a term in the penitentiary. At this point, plaintiff's counsel said, "Haven't you got through torturing him enough?" and "His wife is sitting out here." Defendant's counsel objected to these comments but the Court did not rule on the objections until the following day. In the meantime, the jury filed out, passing a woman who was sitting in the back of the courtroom weeping. The next day, the Trial Court instructed the jury to disregard this occurrence. In the final summation to the jury, however, plaintiff's counsel told the jury that Mr. Ford had been entrapped into lying about his conviction; that in Mr. Ford's position, with his wife in the courtroom, plaintiff's counsel would also have lied. The Appellate Court thought the jury must have regarded Mr. Ford as a hero, and said (307 Ill.App. at page 364, 30 N.E.2d at page 167):

"It is idle to argue that defendants were not seriously prejudiced by the actions of Ford's wife."

We have treated these cases in some detail to indicate the factors which clearly distinguish them from the case before us.

It is obvious that the District Judge, who heard the testimony and observed the witnesses, placed less than full credence in the evidence of Appellant's witnesses regarding the several issues of fact involved in this case. Appellant does not question the general rule that the Trial Judge must be the trier of the issue of credibility, but urges that there is no proof in the record to support the conclusion that Ruth Rinehart acquired her interest solely as an accommodation agent for Mrs. Snodderly, and that the funds out of which the property was purchased came in part from Mrs. Snodderly and in part from her daughter.

In the light of the conflicts and discrepancies in the testimony, we believe that the Trial Judge relied on reasonable inferences fairly drawn from the evidence in the record. We do not consider his findings clearly erroneous and, therefore, we may not set them aside. Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C.A.

Appellant contends that plaintiff has failed to adduce proof of insolvency; that, aside from the secured creditor, the only two proved debts at the time of Mrs. Snodderly's conveyance totalled $145.40.

This assertion is based on the dates set forth in two of the claims filed in the bankruptcy estate; other claims filed therein do not indicate the dates when the obligations were incurred. Further, appellant argues that no evidence was elicited as to Mrs. Snodderly's ability to meet these debts at the time of the conveyance.

Appellant relies on State Bank of Clinton v. Barnett, 1911, 250 Ill. 312, 319, 95 N.E. 178, 181 which discusses a number of cases on this point and holds:

"To impeach such a conveyance successfully it lies upon the complainant to aver and prove that he was a creditor at the time and that the grantor was then insolvent, or such facts and circumstances as would authorize a court or jury to presume insolvency, * * *"

Plaintiff considers Clinton overruled by Birney v. Solomon, 1932, 348 Ill. 410, 414, 181 N.E. 318, 320, wherein the Court said:

"The established rule in this State does not require proof of actual insolvency in order to render a voluntary conveyance void, especially where the conveyance is between husband and wife or parent and child. The true test in determining the validity of a voluntary conveyance as against creditors in such a case is whether or not it directly tended to or did impair the rights of creditors."

and Cairo Lumber Co., Inc. v. Ladenberger, 1941, 313 Ill.App. 1, 6, 39 N.E.2d 596, 599, where the Court said of conveyances from a mother to her son:

"Defendants contend that proof of insolvency of the grantor at the time of the conveyances is essential in order to set aside a voluntary conveyance and as authority for this contention cite the case of State Bank of Clinton v. Barnett * *. Some expressions in that case indicate that such proof is required but we think the correct rule is the one laid down by the more recent case

of Birney v. Solomon quoted above wherein it is stated that proof of actual insolvency is not necessary."

There can be no question that the conveyance here directly tended to impair the rights of creditors.

Appellant replies that the rulings of Illinois Courts have been confused as to whether actual insolvency must be proved, but that Appellant considers Clinton to represent the better rule as it has recently been cited with approval by the Illinois Supreme Court in Laterza v. Murray, 1954, 2 Ill.2d 219, 222, 117 N.E. 2d 779. However, the Laterza case is distinguished from Birney, Cairo, and the case before us, in that there is nothing to indicate that the sale and conveyance from John Murray to Michael Laterza, sought to be set aside by Mrs. John Murray, was other than an ordinary sale to a non-related third person.

Appellant takes the position that the realty was exempt from the claims of the Trustee as joint tenancy property and, as such, exempt from creditors until the joint tenancy was severed, citing Van Antwerp v. Horan, 1945, 390 Ill. 449, 551, 61 N.E.2d 358, 161 A.L.R. 1133 and Jackson v. Lacey, 1951, 408 Ill. 530, 532, 97 N.E.2d 839.

In the first case, Bertha G. Van Antwerp sought to restrain the Bailiff of the Municipal Court of Chicago from selling realty she had purchased from Eva M. Ormond. Mrs. Ormond had owned the realty in joint tenancy with her husband, against whom Englewood Hospital Association had recovered a judgment on which execution issued and levy was made. Mr. Ormond died. Mrs. Ormond sold the property to Bertha G. Van Antwerp. Later, Harry L. Peters purchased Englewood Hospital Association's interest in the judgment. The Bailiff and Mr. Peters moved to dismiss the action on the ground that making the levy severed the joint tenancy and rendered Mr. Ormond's interest subject to be sold by the Bailiff. The Trial Court denied the motion and ultimately entered a permanent injunction. On appeal, the Illinois Supreme Court held

that a joint tenancy was not severed by levy under execution on the share or interest of one of the joint tenants. The Court did say (390 Ill. at page 452, 61 N.E.2d at page 359):

> "It is recognized that the interest of the joint tenant in real estate is subject to levy and sale upon execution. Johnson v. Muntz, 364 Ill. 482, 4 N.E.2d 826."

But the Illinois Supreme Court distinguished the case before it from cases in other jurisdictions where levy on real estate is made by seizing the same, and thus altering unity of interest, with resulting severance of the joint tenancy. In Illinois, the Court said (390 Ill. at page 455, 61 N.E.2d at page 360):

> "* * * it appears that the levy is just another step in the process directed toward a final sale. * * * There has not been, *as yet*, the destruction of identity of interest or of any other unity which must occur before we can say the estate of joint tenancy has been severed * * *." (emphasis supplied.)

The decree of the lower Court was affirmed.

The Jackson case concerned realty owned by Lucille and Walter Lacey in joint tenancy. A creditor of Mr. Lacey reduced his claim to a judgment, levy was made on Mr. Lacey's interest in the realty, and that interest was sold by the Bailiff. Mrs. Lacey was the purchaser. Before the time of redemption from the sale expired, Mrs. Lacey died. Mr. Lacey quitclaimed the entire property to Max Schorvitz. Mrs. Lacey's brother and five sisters sought and were denied the right to partition the property, in which they claimed a one-half interest as Mrs. Lacey's only heirs at law (with the exception of her husband). The brother and sisters relied on Johnson v. Muntz, supra, for their contention that a Sheriff's sale of the interest of one joint tenant severed the joint tenancy. The Illinois Supreme Court, on appeal, distinguished the Johnson case, where the parties had recognized that the issuance of the Sheriff's deed (before the parti-

tion suit had been filed in the Johnson case) was an act of severance. But in the Jackson case, the Illinois Supreme Court found that the Bailiff's sale, together with certificate of purchase, was not, in law, a conveyance, as (408 Ill. at page 532, 97 N.E.2d at page 840):

> "That act cannot be committed until after the period of redemption has expired *sans* redemption."

and, after discussing the Van Antwerp case (408 Ill. at page 533, 97 N.E.2d at page 841):

> "* * * sale is but another step forward toward a divestiture of title which can only come about at a future time, if not barred by a redemption."

Here also the decree of the lower Court was affirmed.

Thus, it appears that neither of these cases alters the general principle enunciated by Tiffany:

> "If one joint tenant becomes a bankrupt, the involuntary transfer of his interest to the trustee, which then takes place, would presumably operate to effect a severance, * * * However, the issuance of an execution after the death of the debtor does not have this effect, even though the judgment was docketed before he died, as upon his death the title vests in the survivor, and there remains no interest upon which the execution can operate." The Law of Real Property, by Herbert Thorndike Tiffany, 3rd Ed., by Basil Jones, Vol. 2, 1939, Sec. 425, p. 211)

We have given careful thought and consideration to all other arguments advanced by Appellant, but find no basis for reversing the decision of the Trial Court, which is hereby affirmed.

CASTLE, Circuit Judge (dissenting).

I find myself in disagreement with the majority opinion insofar as it holds that under the facts here involved Illinois law does not require proof of insolvency at the time of the conveyance sought to be set aside.

Unlike the situation in Birney v. Solomon, 348 Ill. 410, 181 N.E. 318, relied upon by the majority, where the bank, an unsecured creditor on loans extending over a period of years, required annual financial statements disclosing the merchant-debtor's assets, there was, in the instant case, no evidence of reliance by a creditor on Mrs. Snodderly's ownership of the joint interest involved. In view of this I am of the opinion that the doctrine expressed in State Bank of Clinton v. Barnett, 250 Ill. 312, 95 N.E. 178, and reaffirmed by Laterza v. Murray, 2 Ill.2d 219, 117 N.E.2d 779 applies. And, there being no proof of insolvency of Mrs. Snodderly at the time she made the conveyance to her daughter, or of facts from which such insolvency could properly be presumed or inferred, I would reverse. The fact that the grantee in Laterza was a stranger does not in my opinion justify the majority in treating that factor as affording a basis for distinguishing Laterza from Birney.