## UNITED STATES v. 36 DRUMS OF POP'N OIL.

### No. 11917.

Circuit Court of Appeals, Fifth Circuit.

Nov. 14, 1947.

SIBLEY, Circuit Judge, dissenting.

———◆———

Theron L. Caudle, Asst. Atty. Gen., and John T. Grigsby, Atty., Dept. of Justice, of Washington, D. C., and J. Ellis Mundy, U. S. Atty., and Allen E. Lockerman, both of Atlanta, Ga., for appellant.

Durwood T. Pye, of Atlanta, Ga., for appellee.

Before SIBLEY, HUTCHESON, and HOLMES, Circuit Judges.

HOLMES, Circuit Judge.

Pursuant to a libel filed by the United States, thirty-six drums of mineral oil, under the trade name of Pop'n-Oil, were seized and held in the custody of the Marshal, pending further orders of the court below respecting the same. The libel of information alleged that said oil was adulterated within the meaning of Section 342 (b) (2), (b) (3), and (b) (4), Title 21, of the United States Code, Annotated, and that it was also misbranded within the meaning of Section 343(b) of said code. After a trial upon the merits, the court vacated the seizure, ordered possession of the oil restored to the claimant, and dismissed the libel.

The court below held that the article seized was not harmful, that the drums were not misbranded, and that, in the absence of any definition or standard of identity prescribed by the Administrator, the true labeling of the article was a compliance with the Act.

The drums contained 99.3% mineral oil, artificial color and flavoring constituting the other seven-tenths of one per cent. This product was sold, shipped, and intended to be used as food. When popcorn is popped with Pop'n-Oil, the corn absorbs a substantial amount of the oil, so that 100 ounces of prepared corn would have in it from six to seven ounces of Pop'n-Oil. From a scientific standpoint, this was a very considerable amount, it being generally recognized that mineral oil has no food value. According to one dealer, who was a witness, the popcorn sold by him contained about 12½% of mineral oil. As to the harmful effects from the use of mineral oil as a food, the expert testimony (developed by questions from the court) is positive and uncontradicted.[1] The product under seizure is of a rich yellowish color, and

---

[1] "Q. All right, with respect to the question that was put to you about the use of mineral oil as a making of salad dressing, and so forth, can you state whether or not the medical authorities approve the use of mineral oil in salads or anything else, any other—A. There is a report in the Journal of the American Medical Association for 1942, by the council on food and nutrition, council of the American Medical Association, in which they give an adverse report on the use of mineral oil in food, mineral oil—I mean salad oils, mayonnaise, and so forth.

"By the Court:

"Q. For what reasons? Do they say why it is? A. The reason they give is that mineral oil in the gastro-intestinal tract, in the alimentary tract, absorbs a very large quantity of carotin. Carotin is the chemical substance which the body uses to synthesize vitamin A, which is an essential vitamin. It also interferes to a lesser extent with the absorption of vitamin A itself. It interferes also with the absorption of vitamin D, which is an essential vitamin. It interferes with the absorption of calcium and phosphates which are necessary for bone building, and also it has been found recently in experimental work that it interferes with the absorption of vitamin K, from the gastro intestinal tract. Vitamin K is important and necessary for normal clotting of blood.

"Q. Do you know whether or not it is the general practice of doctors to pre-scribe the use of mineral oil in salads where they desire to reduce a person's weight? A. It has been done.

"Q. Isn't that rather a general practice? A. I think it is quite general. I am not a practicing physician, however, and my opinion would be of a layman.

"Q. Was it in your opinion as a layman or a professional man that you have been discussing about the effect of mineral oil in the system? A. That is professional.

"Q. Beg pardon? A. That is an opinion as a specialist.

"Q. You consider yourself qualified to give those views and not qualified to give the latter? A. I would say that as most individuals become cognizant or aware of things that physicians do, and that is one of them. I know that.

"Q. Why did you testify in one instance as a layman and in another instance as a specialist, that is the only thing I am asking? A. I was answering your question, Your Honor, to the effect that I do happen to know from reading and contact, that that is done. Now it is possible that if I had not been interested or were not interested in medical problems in general, I might not notice those things. But I do happen to know that that has been done and is being done.

"By the Court:

"Any other questions?

"By Mr. Lockerman:

"Q. Your special field is pharmacology? A. My special field is pharmacology.

"Q. Yes, sir. You may come down."

resembles the color of melted butter. The types of oil ordinarily used in the popping of corn are cocoanut, cotton-seed, and soybean, but during the war there was a shortage of these oils, and some distributors sold mineral oil for that purpose. Until the shortage of vegetable oils brought on by the war, mineral oil had never been used for popping corn. Mineral oil has no food value whatever, and therefore does not add to the food value of popcorn. A quantity of 6 or 7 per cent of any ingredient added to a food is a considerable rather than an infinitesimal amount. At the close of the Government's case, the claimant rested without adducing any evidence.

Although the Government has abandoned its charge of misbranding, it has not abandoned any of its charges of adulteration but has concentrated its argument in this court on the following specific questions:

1. Whether the court erred in concluding that, in the absence of a definition and standard of identity promulgated under 21 U.S.C.A. § 341, the truthful labeling of the article was a compliance with the Act.

2. Whether the court erred in concluding that the truthful labeling of the article exempted it from the provisions of 21 U.S.C.A. § 342(b) (3) and (4).

3. Whether the court erred in failing to find from the uncontroverted evidence that the article was adulterated within the meaning of 21 U.S.C.A. § 342(b) (3) and (4) when introduced into or while in interstate commerce.

The relevant statutory provisions are Sections 304(a), 401, 402(b) (3), and 402 (b) (4) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C.A. § 334(a), 341, 342(b) (3), and 342(b) (4).

We think the adulteration of the product was not cured by its truthful labeling. Adulteration should not be confused with misbranding. The ultimate consumer of the popcorn probably never sees the labeling. The cartons containing the popcorn, sold in theatre vending machines, do not contain any statement showing that the popcorn dressing consists of 99.3% mineral oil, artificially colored and flavored. We think the Government's evidence sustained its allegations of adulteration under 21 U. S.C.A. § 342(b) (3) and (4).

Even in the absence of a reasonable definition and standard of identity, promulgated under 21 U.S.C.A. § 341, truthful labeling does not exempt an article from the provisions of 21 U.S.C.A. § 342(b) (3) and (4), which provide that a food shall be deemed adulterated if damage or inferiority has been concealed in any manner; and also that a food shall be deemed adulterated if any substance has been added thereto or mixed or packed therewith so as to make it appear better or of greater value than it is.

In the instant case, mineral oil has been artificially colored and flavored to make it look like butter or vegetable oil. That mineral oil is inferior to melted butter on popcorn is plain. It is also inferior to cocoanut, soybean, or cotton-seed oil. To conclude that a food for which a standard of identity has not been promulgated is exempt from the economic adulteration provisions of the Act would result in rendering inoperative all of 21 U.S.C.A. § 342(b). The Administrator is not required to promulgate definitions and standards of identity for foods under any and all conditions. Administrative selectivity in such standardization is a part of his discretion and responsibility. To permit a class of foods not so selected to escape other applicable provisions of the law would create a loophole which the Act sought to avoid.

The evidence compels the conclusion that the oil sought to be condemned was artificially prepared to appear to be an acceptable popcorn dressing made from vegetable oil having a substantial food value, or from butter. It is a matter of common knowledge, of which the court may take judicial notice, that for use as food melted butter is superior to mineral oil.

The decree appealed from is reversed, and the cause remanded to the district court with directions to enter a decree of condemnation against the articles seized.

Reversed.

SIBLEY, Circuit Judge (dissenting).

Zeal for enforcement, I think, is here outrunning common sense and the true in-

tent of the law. The seizure was made in 1943, in the midst of the late war. Theretofore the dressing for popped corn had been some animal or vegetable oil, such as melted butter, cocoanut oil, soybean oil, cottonseed oil, or Wesson oil. Because of war conditions, cocoanut oil could not be had at all, butter and cottonseed oil, soybean and Wesson oil, which had food value, became scarce and practically unobtainable because of the war demand for foodstuffs. Something else had to be substituted in the popcorn business, carried on at movie theaters and similar places of amusement, where popcorn is eaten in idleness and not for nutriment. Mineral oil, which had long been used in salad dressings in place of olive oil and the like, and is still so used, came into general use for the popcorn dressing. It was colored light yellow, (which is the natural color of most oils and greases unless refined out), and was flavored to give the popcorn some taste. No point whatever is here made against adding the flavor. There is only the charge that a color was added which made it look more like melted butter. There is no evidence as to the color of cocoanut oil, cottonseed oil, soybean or Wesson oil which also it was substituting. There is no evidence that the intent was to make it look like butter, or that any eater of popcorn thought it was butter, or cared. There was no effort at deceit while in interstate commerce, with which alone the federal Act is concerned. The seized drums were frankly labelled: "Pop N Oil, made from Liquid Petrolatum, Plastic Butter Flavor, Artificial Flavoring. Color Added. Distributed by Wilkin Theater Supply, Inc." The charge of misbranding is expressly abandoned, as it must be. Only adulteration is claimed. As to that it was on the trial expressly stated by government counsel: "If your honor please, we don't make any charge in this proceeding that the product is injurious to health or deleterious." It is true the court pressed questions as to that upon a witness as quoted in Note 1 of the opinion, but on the entire evidence he found that "the mineral oil was neutral and not harmful." The evidence is specific that in a nickel package of popcorn, which weighs one ounce, there would be only one-sixteenth of an ounce of dressing, say a half-teaspoonful. That is, by common experience with mineral oil, negligible. The law intends to keep deceitful or injurious mixtures out of interstate commerce, but it does not aim to exclude all mixtures. Where petrolatum is sold as such, frankly stated to be artificially colored and flavored, and is perfectly harmless for the use intended, which is really more for entertainment than for feeding, it seems hypercritical to me at a time when war had forced all manner of substitutions in food, to condemn these drums of fifty gallons each as forfeited by law because of adulteration.

HUTCHESON, Circuit Judge (Specially concurring).

I agree with my brother SIBLEY that in this case, "Zeal for enforcement, I think, is here outrunning common sense and the true intent of the law." I agree with my brother SIBLEY, too, that the case does not involve any charge that the product is injurious to health or deleterious. The opinion adduced by the judge himself and set out in the note to the majority opinion is therefore immaterial and irrelevant to the issues in this case. Further being merely the statement of the opinion of the witness as to a report in the Journal of the American Medical Association, it is hearsay and inadmissible and carries no weight whatever. I cannot therefore agree with the statement in the majority opinion that there is positive and uncontradicted testimony that the use of mineral oil as a food, as in this case, was, or could be harmful.

Notwithstanding, however, my opinion that the whole proceeding is a tempest in a teapot and that its bringing was an administrative error, I am compelled to agree with the views of my brother HOLMES that, within the meaning of the statute under which the suit was brought, section 342 (b) (3) and (4), the article in question was adulterated. It was adulterated under subsec. (b) (3) by having its inferiority to butter concealed by making it look like butter. It was adulterated under subsec. (b) (4) by being so colored as to "make it ap-

pear better or of greater value," that is by making it appear to be melted butter. I, therefore, concur in the conclusion the majority opinion reaches that the cause must be reversed and remanded with directions.