**UNITED STATES v. 88 CASES, MORE OR LESS, CONTAINING BIRELEY'S ORANGE BEVERAGE.**

No. 10170.

United States Court of Appeals
Third Circuit.

Argued Dec. 19, 1950.

Decided March 23, 1951.

As Amended May 3, 1951.

Rehearing Denied May 28, 1951.

Henry S. Drinker, Philadelphia, Pa. (Hayward H. Coburn, Philadelphia, Pa., Lester E. Waterbury, Arthur D. Wingebach, and Stanley Thea, all of New York City, Joseph J. Summerill, Jr., Sidney P. McCord, Jr., Camden, N. J., on the brief), for appellant.

Grover C. Richman, Jr., Camden, N. J. (Alfred E. Modarelli, U. S. Atty., Newark, N. J., Edward E. Turkel, Washington, D. C., Edward K. Edelshein, Attorneys, Federal Security Agency, on the brief), for appellee.

Before MARIS, McLAUGHLIN, and HASTIE, Circuit Judges.

HASTIE, Circuit Judge.

Pursuant to its libel charging economic adulteration of certain food within the meaning of Section 402(b) (4) of the Federal Food, Drug and Cosmetic Act,[1] the United States seized for condemnation 88 cases of an article of food labeled "Bireley's Orange Beverage".[2] The charges thus asserted were tried to a jury in the District Court for the District of New Jersey with a resultant finding of adulteration and a decree of condemnation. This appeal by General Foods Corporation, the owner of the food, followed.

Section 402(b) (4) declares that: "A food shall be deemed to be adulterated * * (b) * * * (4) if any substance has been added thereto or mixed or packed therewith so as to increase its bulk or weight, or reduce its quality or strength, or make it appear better or of greater value than it is."

In this case the United States charged and undertook to prove that the "food" in question—Bireley's Orange Beverage—was "adulterated" within the meaning of the statute in that "substances"—particularly, yellow coal tar dyes, sugar, lactic acid, and orange oil—had been "added thereto or mixed therewith * * * so as to make it appear better or of greater value than it is."[3] The appellant, General Foods

---

1. 52 Stat. 1046–47, 1938, 21 U.S.C.A. § 342 (b) (4) (1946).

2. The article is described in the libel, in detail, as follows: "88 cases, more or less, each containing 24—6¾ fluid ounce bottles of an uncarbonated beverage labeled:
(crown cap) "Bireley's Orange Beverage Contains water, orange pulp & juice, lemon pulp & juice, sugar, lactic acid, orange oil, artificial color Bireley's, Inc., Phila., Pa."
(bottle label) "Enjoy Bireley's Daily for Real Fruit Taste, Bireley's, Inc., Phila., Pa., 6¾ fl. ozs. Non-carbonated."

3. In terms, the libel charged that this article of food was adulterated first, "in that yellow coal tar dyes have been

Corporation, raised questions concerning the meaning and application of the statute, the sufficiency of proof, the correctness of the trial charge, and the admissibility of certain evidence.

Preliminarily, we consider an argument that the types of processing and manufacture covered by Section 402(b) (4) should be limited by a strict grammatical application of the words of the statute. Such an approach suggests that the noun "food" used in the introductory line of the section, and the articles and adverbs referring back to it be applied precisely and consistently to denote either an adulterated end product or an unadulterated original food. Further, it is argued that the statutory description of adulteration in terms of substances "mixed with" or "added to" a "food" limits the application of the section to situations in which the process of manufacture has been the modification of a basic identifiable and unadulterated article of food through the introduction of some additive.

█ We reject this restrictive analysis. In Section 402(b) (4) we think Congress has employed a very brief text, informally phrased in non-technical language, to cover generally a very considerable and diverse, but not precisely delimited, field of processing and fabrication. We view the language of the section as a comprehensive, if not always grammatically precise and consistent, description applicable to the manufacture and processing of foods generally, whether a recognized food is altered or sundry ingredients are combined or compounded to make what is essentially a new article of manufacture. Moreover, we think this broad coverage of diverse procedures is sufficiently clear for common understanding and practical application.

Such broad and non-technical construction of the language in question is supported by the only two cases which have come to our attention where Courts of Appeals have had to consider the scope of the section. In United States v. Two Bags [Poppy Seeds], 6 Cir., 1945, 147 F.2d 123, the product seized was white poppy seeds which had been artificially colored with charcoal. The result was that they looked like naturally dark poppy seeds. The market for the naturally dark seeds was substantially better than that for white seeds. The court held that the product, artifically colored white seeds, was adulterated under 402(b) (4) because it appeared to be the naturally dark seeds although in fact it was not. "Food" in the introductory line of the section under this construction thus meant the artificial product. The Court in effect held that the processed article, artificially colored white poppy seeds, is an adulterated product because it is made by mixing with white poppy seeds (the base food) an additional product, charcoal, to cause the white poppy seeds to appear to be naturally dark poppy seeds, and thus better or of greater value than they, the white poppy seeds, in fact are. Under no technically grammatical reading of Section 402 (b) (4) could this result have been reached. Yet, under no circumstances could it be considered an unfair, improper, or surprising conclusion as to the meaning of the section in relation to the facts of the case.

A substantially similar problem was presented in United States v. 36 Drums of Pop'n Oil, 5 Cir., 1947, 164 F.2d 250. There, mineral oil artificially colored yellow to resemble butter, and used in popping corn in theatre machines, was held to be an adulterated product. The sense of the statute in relation to this process was clear.

mixed therewith so as to make the said food look like a product composed entirely or in large part of a fresh orange juice and thus better and of greater value than it is," and second, "in that it consists of a mixture of a small quantity of concentrated citrus juice or juices and water, to which have been added additional water, in excess of that contained in the fresh juices from which the concentrates were made, sugar, lactic acid

and orange oil, which substances so added to the said food increase the bulk thereof and give it the taste and odor of an orange juice or of a beverage containing a large quantity of an orange juice, thereby making the said food appear better and of greater value than it is." Neither at the trial nor on appeal has much point been made of the water content or the added bulk.

The grammar of its application was not treated as important.

■ In the context of the present case, it is our conclusion that the language of Section 402(b) (4) covers a situation in which the challenged process of manufacture was the inclusion of one or more designated ingredients among the primary integral components of a distinct fabricated article. It is not important whether the final product has been achieved by a direct dilution of orange juice or, as here, by a more complex process of fabrication.

More difficult questions arise in construing and applying the requirement of the statute that admixture shall have made the food "appear better than it is". To whom must the food appear better than it is? And how is it to be determined whether the food "appears better than it is"?

With reference to the first question, the trial judge charged the jury as follows: "Your function in this case is to determine whether any part of the public, the vast multitude which includes the ignorant, the unthinking and the credulous, and those who do not stop to analyze in making a purchase would be so misled." We have found nothing else in the charge which modifies the impression created by this statement. The jury was told that deceptive appearance to "any part" of the public sufficed and the significance of "any part" was emphasized and underlined by the accompanying reference to "the ignorant, the unthinking and the credulous". This was error.

■ The correct standard was the reaction of the ordinary consumer under such circumstances as attended retail distribution of this product. When a statute leaves such a matter as this without specification, the normal inference is that the legislature contemplated the reaction of the ordinary person who is neither savant nor dolt, who lacks special competency with reference to the matter at hand but has and exercises a normal measure of the layman's common sense and judgment. What constitutes the norm of common sense and judgment is peculiarly the province of the jury to decide by relating common experience in the conduct and reaction of people to the circumstances at hand and by weighing such evidence as may be offered of the actual reactions of numbers of ordinary people in similar circumstances. Congress has indicated no extraordinary standard in this section under consideration and we find no basis for imposing one.

■ In Section 403(f) of the Act which deals with misbranded food, it is expressly stated that the branding must be such as is "likely to be read and understood by the ordinary individual under customary conditions of purchase and use". It would be unreasonable to conclude that an abnormal and more burdensome standard results from the fact that Congress did not deem it necessary to specify a test in Section 402 (b) (4). We think that essentially the same standard should be applied to the determination of consumer reaction under both sections.

■ This formulation also disposes of an issue that has arisen whether such matters as bottling, labeling and retail price, as well as the taste and physical appearance of the food, constitute appearance under the statute. In our view, all customary circumstances of retail acquisition and consumption are relevant. Thus, the bottling and labeling of the libeled article are properly considered unless it is shown that some considerable part of the retail trade acquires the beverage without such packaging. Compare United States v. 62 Cases, More or Less, Containing Six Jars of Jam, 10 Cir., 1950, 183 F.2d 1014; certiorari granted, 1950, 340 U.S. 890, 71 S.Ct. 207. Of course, consumer habits in observing or not observing details of packaging are relevant and may be weighed by a jury in determining the effect of container markings upon the consumer.

We next consider what is meant by a description of food as appearing "better than it is" and what criteria are applicable to the determination of such apparent superiority over actual quality. It is not disputed that Bireley's orange drink is in a category of non-carbonated orange flavored soft drinks which has enjoyed a considerable public acceptance and for which there exists a substantial market. Several

states have recognized this by establishing standards of quality and identity for such orange drink. This type of beverage has no great nutritive value but it is not deleterious.

The parties agree that Bireley's orange drink contains about 6% orange juice, 2% lemon juice, 87% water, and small quantities of various other harmless substances. Undoubtedly, any percentage increase in the orange juice content with a corresponding decrease in water content would represent some improvement in food value. Hence, literally the product appears better than it is if it appears to the consumer to contain more than 6% orange juice.

But here we encounter serious difficulties of vagueness. The statutory test in Section 402(b) (4) is unreasonable and unenforceable if it requires manufacturers in first instance to anticipate and the trier of fact thereafter to measure anything so speculative or even whimsical as the customer's guess whether an artificial beverage contains five, six, seven, or some other percentage of orange juice. Popular judgments as to degree of dilution, more or less than actuality, are in our view too vague and speculative for meaningful guidance or fair and practical administration of a prohibition against the introduction of otherwise unobjectionable food into commerce. The difficulty with this entire approach is that the "adulterated" food is made to serve as its own only standard.

██ The solution to the problem and the correct construction of the statutory language are to be found in the rationale of the legislative exclusion of products from commerce for economic adulteration where no hygienic adulteration exists. In such cases a product is recognized as wholesome but is excluded from commerce because of the danger of confusing it with something else which is defined, familiar, and superior. Cf. Comments of Congress-

man Lea at 83 Cong.Rec. 7773 (1935). There is no evidence to indicate a legislative intent to bar from the market foods which are wholesome merely because they may in fact be of relatively little value. So long as they are not confused with more wholesome products, their presence does no harm. Compare Stone, Ch. J. in Federal Security Administrator v. Quaker Oats Co., 1943, 318 U.S. 218, 232, 63 S.Ct. 589, 87 L.Ed. 724. Without a finding that a marketable inferior product is likely to be confused with a specified superior counterpart, we think there can be no appearing "better than it is" within the scope of disapproval of a section patently concerned only with confusion.[4] Thus, in the case before us, proof of violation of the statute requires first description and definition of the superior counterpart, and second, proof that the consumer is likely to mistake the inferior for the superior.

United States v. Ten Cases, More or Less, Bred Spred, 8 Cir., 1931, 49 F.2d 87, which was decided under the 1906 forerunner of the present Act is helpful in indicating the scope of this problem. This was a libel charging misbranding and adulteration under the subsection which then read "an article shall be deemed to be adulterated. * * * In the case of food * * * If it be mixed, colored, powdered, coated, or stained in a manner whereby damage or inferiority is concealed". Apparently, Bred Spred, which bore some resemblance to jam, contained approximately 17 parts fruit to 55 parts sugar, whereas most commercial jams were made up of 45 parts fruit to 55 parts sugar, and that of most housekeepers contained fruit and sugar in a 50–50 ratio. The court held that the product was not adulterated, pointing out: "There was no proof that Bred Spred contained any damaged or any harmful or deleterious substance. The word 'inferiority' in the statute raises the question, What is the other member of the

---

4. Sen.Rep.No.493, 73rd Cong., 2d Sess. (1934) at p. 10 recites the following: " * * * under the present law and under the bill, a food is defined as adulterated if any substance has been mixed or packed with it so as to reduce its strength, or if any substance has been substituted wholly or in part therefor. These provisions in themselves imply the existence of definitions and standards of identity, since no one can tell when an article is adulterated under them without first determining definitely what constitutes the unadulterated product".

comparison? Or, in other words, the question, Inferior to what? * * * The mere fact that the product contained fewer strawberries than some other product, e. g., jam, does not * * * show that a comparison with jam was called for by the statute unless Bred Spred was being palmed off on the public as jam. No showing of this kind was made." 49 F.2d at page 90.

Concealment of inferiority to jam could not be in issue until the relevance of a comparison with jam was established. This, in turn, depended on whether Bred Spred was likely to be confused with the defined commercial or household product called jam. The court did not think it was justified in reaching such a conclusion from the record before it. Thus, the Bred Spred case demonstrates the necessity and significance of showing the relationship in public contemplation between the allegedly adulterated product and some familiar and defined standard which it resembles. It makes little sense to speak of concealment of inferiority except when we add *to what*. It makes equally little sense to speak of misleading enhancement of appearance except in relation to some standard which by some reasonable technique has been made relevant.

Recently, the Court of Appeals for the Tenth Circuit has held that the addition of water to canned tomatoes resulted in adulteration of that product. United States v. 716 Cases, More or Less, Del Comida Brand Tomatoes, 1950, 179 F.2d 174. The court states the purpose of the Act to be the protection of the consumer "from 'economic adulteration' by which less expensive ingredients are substituted, or the proportion of more expensive ingredients are [sic] diminished so as to make the commonly identified article inferior to that which the consumer would expect to receive when purchasing it, although not in itself deleterious." 179 F.2d at page 176. Again, the conclusion on adulteration is rested squarely on the deception potential of the product sold in relation to a familiar standard.

 In the instant case, undiluted orange juice is the only defined and familiar food pointed out in the libel and in evidence as possibly to be confused with Bireley's Orange Beverage. We therefore agree with the claimant that the issue on this aspect of the case is squarely this: Would the ordinary consumer confuse claimant's product with undiluted orange juice? Cf. United States v. Nesbitt Fruit Product, 5 Cir., 1938, 96 F.2d 972.

 Legislative consideration of the problem of standards under the Act gives further support to our conclusion that Section 402(b) (4) is not applicable if the allegedly adulterated food is its own only standard. The inability of the government to establish enforcible standards for fabricated foods, considerably hampered the work of enforcement of the 1906 Act. The solution to this problem suggested in the course of legislative consideration of the 1938 bill, and in due course adopted, was the enactment of provisions giving the Secretary of Agriculture power to promulgate standards of identity for foods. Such standards were to be imposed only after full and fair hearing.[5]

5. The House Report on the Act of 1938 stated: "Section 401 provides much needed authority for the establishment of definitions and standards of identity and reasonable standards of quality and fill of container of food. One great weakness in the present food and drug laws is the absence of authoritative definitions and standards of identity except in the case of butter and some canned foods. The Government repeatedly has had difficulty in holding such articles and commercial jams and preserves and many other foods to the time-honored standards employed by housewives and reputable manufacturers. The housewife makes preserves by using equal parts of fruit and sugar. The fruit is the expensive ingredient, and there has been a tendency on the part of some manufacturers to use less and less fruit and more and more sugar.

"The Government has recently lost several cases where such stretching in fruit is involved because the courts held that the well-established standard of the home, followed also by the great bulk of manufacturers, is not legally binding under existing law. By authorizing the establishment of definitions and standards of identity this bill meets the demands of

Questions of various permissible degrees of dilution which were regarded below as relevant and in issue are peculiarly appropriate for disposition by this administrative technique. Under the required administrative procedure, the whole industry can participate in the determination whether orange-flavored soft drinks are capable of satisfactory definition, how their composition should be restricted, and even whether such a food as orange drink, or any of its variants, should be permitted in commerce. Cf. Federal Security Administrator v. Quaker Oats Co., supra.

However, we agree with the government that it is not necessary that this channel be used. We agree that the statute does not foreclose the procedure used here. But as already indicated, we think the procedure used here permits condemnation only where there is confusion with a defined superior product. If the government would go further it must undertake the formulation of standards of identity in this area.

■ The trial court's instruction to the jury did not ask simply and directly whether the Bireley product could be confused with undiluted orange juice. Nor did it ask anything sufficiently close so that we can say that the issue was in effect determined. The court did charge that the government was required to prove that, by virtue of the additions made, the product "has the capacity to deceive". And it also charged that "one type of economic adulteration is that which makes the product, although not deleterious, inferior to that which consumers expect to receive when purchasing a product under the name by which it was sold". But the jury was left free to find economic adulteration if it concluded merely that consumers considered the drink less diluted than in fact it was. Thus, we think the charge of the trial judge did not make the issue clear. It fell short of laying bare the decisive question whether in all the circumstances of acquisition the food was likely to be confused with or mistaken for

orange juice. In a new trial that issue should be made entirely clear to the jury.

Several additional issues were raised. Disposition of two of them seems desirable in view of the fact that the case is to be re-tried.

■ Appellant objected to the admission by the district court of certain surveys taken on behalf of the government. These surveys collate answers given by some 3539 persons to questionnaires prepared by the government to determine what they thought was contained in the Bireley product. Many objections were made to the manner in which the surveys were taken. The principal contention, however, was that the surveys were hearsay and therefore inadmissible. The hearsay objection is unfounded. For the statements of the persons interviewed were not offered for the truthfulness of their assertions as to the composition of the beverage. They were not offered to prove that Bireley's Orange Beverage is or is not orange juice. They were offered solely to show as a fact the reaction of ordinary householders and others of the public generally when shown a bottle of Bireley's Orange Beverage. Only the credibility of those who took the statements was involved, and they were before the court. The technical adequacy of the surveys was a matter of the weight to be attached to them. And claimant was properly permitted to introduce elaborate testimony on this point.

Appellant has also challenged the trial court's admission of testimony and exhibits showing the harmful and painful effects of lack of vitamin C in the diet. It was admitted that Bireley's does not contain vitamin C and that fresh orange juice does. Libellant was permitted to introduce testimony of an expert who had conducted an experiment with sixteen guinea pigs, six of which had been fed a teaspoonful of orange juice per day, six of which had been fed Bireley's, and four of which had been given still a different diet containing no vitamin C. After 21 to 26

legitimate industry and will effectively prevent the chiseling operations of the small minority of manufacturers, will in many cases expand the demand for agricultural products, particularly for fruits, and finally will insure fair dealing in the interest of the consumer."

days of this, the six orange-juice-fed guinea pigs were in fine condition, but the other ten pigs had all died in apparent agony. The expert produced pictures of the guinea pigs with their legs drawn up in apparent agony. Moreover, later evidence was permitted to be introduced showing the development of scurvy in children who drank an orange flavored drink but received no vitamin C.

We agree with appellant that the admission of such testimony was neither necessary nor proper. It is impossible to calculate the effect of such testimony in creating prejudice rather than objective conviction in the minds of the jurors. The only proper issue was the relative food value of orange juice and the Bireley product. It would hardly be disputed, certainly it could be proved simply and impressively yet without sensationalism, that orange juice is much more nutritious, much better in a dietary sense, than Bireley's. Although sensational and shocking evidence may be relevant, it has an objectionable tendency to prejudice the jury. It is, therefore, incompetent unless the exigencies of proof make it necessary or important that the case be proved that way. There was no such need here. On another trial, such evidence should be excluded.

For the reasons heretofore given, the decree of condemnation will be vacated and the case remanded to the district court for further proceedings not inconsistent with this opinion.

Russell, Circuit Judge, dissented.