The **BORDEN COMPANY,** Plaintiff,

v.

**L. B. LIDDY,** Secretary of Agriculture of the State of Iowa, Defendant.

Civ. No. 4–1158.

United States District Court
S. D. Iowa,
Central Division.

Feb. 15, 1965.

See also 8 Cir., 309 F.2d 871.

Maxwell A. O'Brien and Samuel G. O'Brien, Des Moines, Iowa, for plaintiff.

Evan Hultman, Atty. Gen. of Iowa, Des Moines, Iowa, for defendant.

Before JOHNSEN, Circuit Judge, and McMANUS and HANSON, District Judges.

## PER CURIAM.

Because of a slight variance in views on some aspects of this case, individual Memorandums have been prepared and are attached hereto and made a part hereof. The Memorandum of Judge Hanson, which was prepared first, sets out the facts of the situation and these are adopted as the Court's statement.

■ 1. As the several Memorandums indicate, the Court is unanimous in its view that the defendant cannot prohibit the sale in commerce of the plaintiff's 10% milkfat product within the State of Iowa upon the basis that the branding of it as "ice cream" constitutes a labeling violation under §§ 189.9, 189.14, and 190.1(34) of the Iowa Code, I.C.A.

■ 2. The Court is also unanimous in its view that there appears to be no need to issue an injunction against the defendant to insure that he will not engage in further threats or acts of enforcement against the plaintiff in this respect.

■ 3. A majority of the Court (Judges Johnsen and McManus) are of the view that the adulteration provisions of the Iowa Code, § 190.3, I.C.A., are facially applicable to the plaintiff's 10% milkfat food product in its failure to meet the Iowa 12% milkfat quality standard for ice cream, but that the plaintiff has legally failed to demonstrate that, in prescribing a 12% milkfat standard of quality for ice cream, the State has acted arbitrarily, as having gone beyond legitimate state interest, or beyond rational relationship to appropriate local food, health or fraud purpose, or as having imposed an undue burden upon or an unwarranted exclusion against the sale of ice cream generally in commerce. Judge Hanson is of the view that the provisions of § 190.3 should be regarded and construed as not intended by the Iowa legislature to prohibit the sale of 10% milkfat ice cream on the basis of adulteration. He agrees, however, that if the Supreme Court of Iowa should refuse to adopt this construction, the plaintiff would not, on the showing which has been made here, be entitled to have the Iowa 12% milkfat standard declared unconstitutional.

■ 4. The Court is unanimous in its view that no injunction can be granted against the adulteration statute for unconstitutionality as the case stands here.

■ 5. A majority of the Court (Judges Johnsen and Hanson) are of the view that the plaintiff has had its day in court and that as a matter of orderly judicial administration and termination, the case should be disposed of on the basis and posture in which it has been submitted to us. Judge McManus is of the view that, as a matter of justice and in avoidance of multiplicity of actions, the Court should on its own motion request and permit the parties to introduce evidence on the question of whether Iowa's 2% requirement in excess of the federal has a legitimate constitutional purpose.

6. The views indicated herein, on the expressions contained in the Memorandums, as to the consensus reflected by them, shall constitute the findings and conclusions of the Court for purposes of disposing of the case.

## ORDER

On all of the foregoing (with reservation by Judge McManus of his view as to the desirability of reopening the case and in this respect dissenting)

It is ordered by the Court that the requests for injunction be denied and that on this basis the complaint be and hereby is dismissed.

HANSON, District Judge.

This action is for Declaratory Judgment and Injunction and is brought under the provisions of the Federal Declaratory Judgments Act. It involves an actual controversy between the plaintiff and the defendant, and arises under the Constitution and laws of the United States. For the previous history of the case see Borden Co. v. Liddy, D.C.S.D.I. 200 F.Supp. 221 and 8 Cir. 309 F.2d 871.

This case was tried upon a Stipulation of Facts in part as follows:

"The plaintiff is a corporation organized under the laws of the State of New Jersey with its principal place of business in New York City, New York, and duly authorized to do business in the State of Iowa.

"That the defendant, L. B. Liddy, is the duly qualified and acting Secretary of Agriculture of the State of Iowa and as such Secretary is charged with the duty of administering and enforcing the provisions of Chapters 189 and 190 of the 1958 Code of Iowa, as amended, with respect to the standards for ice cream and flavored ice cream, as defined in said Chapters.

"That Section 20.1 of the Regulations of the Federal Food and Drug Administration with reference to ice cream in part reads as follows:

"* * * The kind and quantity of optional dairy ingredients used, as specified in paragraph (e) of said section and the content of milkfat and non-milkfat solids therein, are such that the weights of milkfat and total milk solids are not less that 10 percent and 20 percent, respectively,

of the weight of the finished ice cream; * * *."

"That Chapter 190 Code of Iowa 1958, with reference to adulteration, specifies certain standards for ice cream that are contrary to the federal standards above set out. The Iowa Law with reference to adulteration of foods as contained in Section 190.1(34) Code of Iowa 1958 provides in part as follows:

"34. Ice cream. Ice cream is a pure clean frozen product made of ice cream mix and a harmless flavoring. It shall contain not less than 12 percent by weight of milkfat and not less than 20 percent by weight of total milk solids, except * * *."

"That Section 189.19 Code of Iowa 1958 provides penalties for violation of the aforesaid Section 190.1(34) of the Code of Iowa and the rules and regulations of the Iowa Department of Agriculture.

"That the defendant, L. B. Liddy, as Secretary of Agriculture, in his official capacity, has made demand upon the plaintiff that it comply with the aforesaid provisions of the Statutes of Iowa, specifically Section 190.1(34) Code of Iowa 1958, and threatens to enforce the provisions of Section 189.19 Code of Iowa 1958 against the plaintiff, its officers and employees unless the plaintiff immediately complies with Section 190.1(34) of the Iowa Statutes.

"That the ice cream manufactured and shipped into Iowa and from Iowa into other states by The Borden Company complies with the federal standards hereinbefore referred to and is labeled in compliance with the provisions of the Federal Food Drug and Cosmetic Act.

"That prior to July 1, 1961, the ice cream manufactured by The Borden Company for sale in Iowa contained 12 percent butterfat content, and before that date the ice cream manufactured in the Iowa plant for interstate shipment also contained 12 percent butterfat content.

"That the items of expense if The Borden Company is required to comply with the Iowa 12 percent butterfat law

in its ice cream would amount to approximately $364,000.00 a year additional cost to The Borden Company and not the $250,000.00 referred to in the Complaint."

The Iowa statute makes any product labeled in conformance with federal law deemed to be labeled in conformance with federal law and it is, therefore, properly labeled in Iowa.[1] It is quite clear that the proper interpretation of Section 189.11 is that it applies to Section 190.1(34) as set out in the stipulation. It is noted that Section 189.11 is expressly inapplicable to the ice milk standard and several other standards. This leaves the clear indication that it is applicable to the ice cream standard insofar as it constitutes a labeling standard.[2]

The next question is whether Borden's product is adulterated under Iowa law. Section 190.3 defines what is deemed to be adulterated. Subsections (1), (2), (3), and (10) are argued here as reasons

why Borden's product is adulterated.[3] Sections 189.15 and 189.26 prohibit the product if adulterated under Section 190.3. See Lever Bros. Co. v. Erbe, 249 Iowa 454, 87 N.W.2d 469.

There are two usual types of adulteration. One type of adulteration is when the product is unwholesome. Borden's product is unquestionably not adulterated by reason of being unwholesome. The other type of adulteration is sometimes called economic adulteration. Economic adulteration is the manipulation of the ingredients to confuse or deceive the consumer, although not making the product itself deleterious or unwholesome and although the product is properly and truthfully labeled.[4]

Adulteration based on economic adulteration is a question of fact although it may be established by the legislature or administrative agency so as to preclude contrary findings by the courts. This conclusion is supported by the many fed-

---

1. Sections 189.14 and 189.15 of the Iowa Code, I.C.A. prohibit mislabeling and adulteration:

"189.14. Mislabeled articles

"No person shall knowingly introduce into this state, solicit orders for, deliver, transport, or have in his possession with intent to sell, any article which is labeled in any other manner than that prescribed by this title for the label of said article when offered or exposed for sale, or sold in package or wrapped form in this state."

"189.15 Adulterated articles

"No person shall knowingly manufacture, introduce into the state, solicit orders for, sell, deliver, transport, have in his possession with the intent to sell, or offer or expose for sale, any article which is adulterated according to the provisions of this title."

The second paragraph of Section 189.11 of the Iowa Code I.C.A. states:

"Notwithstanding any other requirements of this chapter, foods and food products labeled in conformance with the labeling requirements of the government of the United States shall be deemed to be labeled in conformance with the laws of the state of Iowa."

2. During oral argument it did appear that Liddy was arguing only that the product was mislabeled. It does now appear, however, in his brief that Liddy has not conceded that the problem is only in labeling.

3. "190.3 Food adulterations. For the purposes of this chapter any food shall be deemed to be adulterated:

"1. If any substance has been mixed or packed with it so as to reduce or injuriously affect its quality.

"2. If any substance has been substituted to any extent.

"3. If any valuable constituent has been removed to any extent.

"10. If it does not conform to the standards established by law or by the department."

4. See Federal Security Administrator v. Quaker Oats Co., 318 U.S. 218, 63 S.Ct. 589, 87 L.Ed. 724; 56 A.L.R.2d 1120; Title 21 U.S.C. § 342(b); United States v. 716 cases Del Comida Brand Tomatoes, 179 F.2d 174 (10th Cir.); United States v. 36 Drums of Pop'n Oil, 164 F. 2d 250 (5th Cir.); United States v. 88 cases Bireley's Orange Beverage, 187 F. 2d 967 (3rd Cir.).

eral cases interpreting statutes similar to Section 190.3(1), (2), (3) I.C.A.[5]

It might be argued that Iowa never intended that a product not itself deleterious or improperly labeled would be prohibited by Section 190.3(1), (2), (3), or (10) and State v. Hutchinson Ice Cream Co., 168 Iowa 1, 147 N.W. 195, L.R.A.1917B, 198 would be support for that position. However, I assume without deciding that Section 190.3(1), (2), (3), or (10) would prohibit a food, properly labeled and not deleterious, if there was an economic adulteration. The burden of proof to establish this fact of economic adulteration is upon the State. This conclusion is also based on the interpretation of similar federal statutes. There is no controlling Iowa case.[6]

Liddy has not carried its burden to prove that Borden's product has a tendency to deceive or confuse customers. Accordingly, I cannot find that Borden's product does tend to confuse or deceive customers. I conclude that there is no economic adulteration established as a fact in this case.[7] "That the dispute turns upon questions of fact does not withdraw it * * * from judicial cognizance. The legal consequences flow from the facts and it is the province of the courts to ascertain and find the facts in order to determine the legal consequences." Aetna Life Ins. Co. of Hartford, Conn. v. Haworth, 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617. Of course, the adjudication must be such as will settle the dispute between the parties. 12 A.L.R. p. 72; 68 A.L.R. 119. See Yates v. United States, 354 U.S. 298, 335, 336, 77 S.Ct. 1064, 1 L.Ed.2d 1356. Also see 6 Moore, p. 3032.

If economic adulteration had been proven, a difficult constitutional question would arise as to whether or not Liddy could require Borden to change its label,[8] or increase the milkfat content in its product as presently labeled.[9]

5. Federal Security Administrator v. Quaker Oats Co., supra; United States v. Carolene Products Co., 304 U.S. 144, 58 S.Ct. 778, 82 L.Ed. 1234; Price v. State of Illinois, 238 U.S. 446, 35 S.Ct. 892, 59 L.Ed. 1400; State v. Schlenker, 112 Iowa 642, 84 N.W. 698, 51 L.R.A. 347.
Section 342(b) of Title 21 is very similar to Section 190.3(1), (2), (3) Iowa Code. United States v. 716 cases Del Comida Brand Tomatoes, supra. (Section 342 (b) (2) was involved. The court held that the test of adulteration under that Section was whether or not there was an economic adulteration and the court reversed and remanded so that such a finding could be made.

6. United States v. 88 cases Bireley's Orange Beverage, supra; United States v. 5 cases Figlia Mia Brand, 2 Cir., 179 F.2d 519. The fact that the action is in the form of a declaratory judgment does not change the burden of proof. See American Universal Ins. Co. v. Dykhouse, 8 Cir., 326 F.2d 694.

7. The Federal Food and Drug Administration findings show that they felt the federal standard, the one now used by Borden, was satisfactory insofar as any standard could prevent deception. Of course, that conclusion may not be proper evidence of that fact in this case. State v. Hutchinson Ice Cream Co., supra, does not hold as a matter of law that such a product would deceive or confuse.

8. If Iowa was to give this interpretation to Section 190.3, Borden could not manufacture its present product and meet both the Iowa and the federal standard. Under the federal statute, the product would have to be labeled "ice cream." Section 343(g) of Title 21 states: "A food shall be deemed to be misbranded * * * [i]f it purports to be * * * a food for which a definition and standard of identity has been prescribed * * * unless * * * (2) its label bears the name of the food specified in the definition and standard * * *."

9. Borden could satisfy both such a State law requirement and the federal requirement by increasing its milkfat content to 12 percent. The dicta in Florida Lime & Avocado Growers v. Paul, 373 U.S. 132, 143, 83 S.Ct. 1210, 10 L.Ed.2d 248, could arguably allow Iowa to require an increase in milkfat content because the federal regulation does not forbid the sale of "Ice cream" containing 12 percent. This position is restated in Head v. New Mexico Board, 374 U.S. 424, 83 S.Ct. 1759, 10 L.Ed.2d 983. There is nothing in Cloverleaf Butter Co. v. Patterson, 315 U.S. 148, 62 S.Ct. 491, 86 L.Ed. 754, 1223, or McDermott v.

I have found no authority where the United States Supreme Court has allowed a product to be prohibited when properly labeled, not deleterious, and not economically adulterated. It is true that products which were not deleterious and which were properly labeled have many times been prohibited because of economic adulteration. Florida Lime & Avocado Growers v. Paul, supra, (Note 9); Federal Security Administrator v. Quaker Oats Co., supra (Note 4); Plumley v. Com. of Massachusetts, 155 U.S. 461, 15 S.Ct. 154, 39 L.Ed. 223; Savage v. Jones, 225 U.S. 501, 32 S.Ct. 715, 56 L.Ed. 1182; Price v. State of Illinois, 236 U.S. 446, 35 S.Ct. 892, 59 L.Ed. 1400; Hutchinson Ice Cream Co. v. State of Iowa, 242 U.S. 153, 37 S.Ct. 28, 61 L.Ed. 217.

Taking Section 190.3(1), (2), (3), and (10) literally, it could be read to mean that a product properly labeled, not itself deleterious, and not economically adulterated is still nonetheless adulterated. The question is whether or not Section 190.3 was intended to have such an absolute application.[10] I cannot conceive that such was intended by the Iowa legislature.

The constitutional questions briefed by the parties are not reached or decided in this case because it must be decided on state law grounds. The product is not mislabeled under Section 189.14 and I find on the record that it does not come within prohibition of adulteration under Section 189.15. The various types of

adulteration have been discussed because of Liddy's contention that the product was adulterated without specifying any particular type of adulteration.

The injunction will not be granted, first, because Section 190.3 is not here shown to be violated, hence it is certainly not concluded to be unconstitutional. Secondly, Borden has made no proper showing under State or Federal law which would allow an injunction to issue preventing the enforcement of this type of statute. Kent Products, Inc. v. Hoegh, 245 Iowa 205, 61 N.W.2d 711.

In Florida Lime & Avocado Growers v. Paul, supra, the court held that the constitutionality of a statute cannot be determined where the record is not sufficient for that purpose. Accordingly, in this case, the constitutionality of the statute on the record now before us cannot be adjudicated, the present record being insufficient for that purpose. The problem in this case is really not quite the same as in the Avocado case because no question of constitutionality is decided in this case. No violation of the alleged unconstitutional statutes has been proven.

### JOHNSEN, Circuit Judge.

I am in full agreement with Judge Hanson's Memorandum that the Iowa Secretary of Agriculture cannot prohibit the sale in commerce of Borden's 10% milkfat product within that State, upon the basis that the branding of it as "ice cream" constitutes a labeling viola-

---

State of Wisconsin, 228 U.S. 115, 33 S. Ct. 431, 57 L.Ed. 754, to show that compliance with State law was possible in the manner in which it is possible for Borden to comply. Of course, the State must be protecting a valid interest and some judges have felt that economic adulteration statutes do not protect a very substantial interest. See dissenting opinion of Justice White in Florida Lime & Avocado Growers v. Paul, supra. In United States v. 36 Drums of Pop'n Oil, supra, Judge Hutcheson characterized this type of case as a tempest in a teapot and Judge Sibley stated that the zeal for enforcement is outrunning common sense.

10. There is no indication that the United States has ever attempted to give such an interpretation to Section 342(b) (1) or (2) which are similar to Section 190.3. In Van Liew v. United States, 321 F.2d 664 (5th Cir.), the court construed these two sections. In that case, the indictments had charged intent to defraud and mislead. Actual intent is not necessary in this area. United States v. Wiesenfeld Warehouse Co., 376 U.S. 86, 84 S.Ct. 559, 11 L.Ed.2d 536. United States v. Fabro, Inc., 206 F.Supp. 523 (a District Court in the Fifth Circuit) held Section 342(b) (1) void for vagueness and unconstitutional.

tion under §§ 189.9, 189.14 and 190.1 (34) of the Iowa Code, I.C.A.

As Judge Hanson declares, these sections would seem to be stripped of any labeling prescriptiveness against Borden's use of the name "ice cream" for its product, by the recognition accorded to federal food-branding requirements in later enacted Iowa § 189.11.

But if this construction of § 189.11 should be a mistaken prognostication of what the Supreme Court of Iowa would hold, the Secretary of Agriculture would still not be entitled to use §§ 189.14 and 190.1(34) to prevent the labeling of Borden's product as "ice cream", for purposes of such sales thereof in commerce as Borden otherwise could have a right to make within the State.

Federal regulation, 21 CFR § 20.1, prescribes the name of "ice cream" as a food identification for Borden's 10% product in any sale of it in commerce, and under 21 U.S.C. § 343(g) (2), the product would federally be misbranded "unless * * * its label bears (that) name". The Supremacy Clause of the Constitution, Art. VI, of course, deprives a State of the power to nullify or prohibit compliance with valid federal legal commands. Iowa might have the right to require Borden to add indication on its label that the ice cream does not conform to the State's local 12% milkfat standard, but it cannot forbid or attempt to prevent Borden from labeling the product as ice cream.

This leaves remaining the question of whether, even though Iowa cannot prohibit the sale of Borden's product as being misbranded, it may still forbid the sale of such ice cream as being violative of its adulteration statute, § 190.3, in not measuring up to the State's 12% milkfat quality-standard. Section 190.3, in its here pertinent part, provides that

" * * * any food shall be deemed to be adulterated: * * * 10. If it does not conform to the standards established by law * * * ".

Judge Hanson's Memorandum construes § 190.3 as being intended merely to protect consumers against deleteriousness or unwholesomeness in food character, and against deception or confusion as to what they may be purchasing. It seems to me that the language of § 190.3 is on its face broader than this, and that in its application to ice cream it must be regarded as making any ice cream, sold as such, which does not conform to the State's statutory 12% milkfat standard an adulterated food under Iowa law.

No legislative history or other indicative material is before us which enables me to say that the statute is entitled to be read restrictively so as not to accord to its language this natural meaning and scope. It is the position of the Attorney General of Iowa in his brief that the sale of Borden's 10% milkfat product as ice cream does constitute a selling of adulterated food under § 190.3. Moreover, in State v. Hutchinson Ice Cream Co., 168 Iowa 1, 147 N.W. 195, L.R.A 917B, 198, aff'd. 242 U.S. 153, 37 S.Ct. 28, 61 L.Ed. 217 the right of the State to prosecute a manufacturer for selling adulterated food was expressly recognized where he was alleged to have sold "a certain food product called ice cream" which "did not conform to the standards established by law", in that it was "deficient in butter fat", because it had less than a 12% milkfat content.[1]

Thus it seems to me that the Iowa adulteration statute plainly is applicable to the situation here and must be allowed to be enforced against Borden's 10% milkfat ice cream unless the State's 12%

---

[1] The Hutchinson case, while recognizing the right of the State to prosecute the manufacturer for adulteration in selling his product as ice cream when it contained less than 12% milkfat, said by way of dictum that the manufacturer was not precluded from selling the product under some other food name ("They may sell it for what it really is"), but only as ice cream. 147 N.W. at 201. This dictum is without significance or application here, since Borden, as stated above, is federally required to sell its 10% milkfat product in commerce as ice cream and may not sell it under any other food name.

milkfat standard is entitled to be held invalid, as being unreasonable or "arbitrary", in not involving "a legitimate state interest", or in being "devoid of rational relationship to a legitimate regulatory interest", or in being "discriminatory or burdensome [as to commerce] notwithstanding a legitimate state interest in some form of regulation".[2]

On what is before us (a generalized stipulation), I am not prepared to hold that the State's 12% milkfat standard is invalid on any of the above grounds, as a basis to deny the State's right to prevent the sale of Borden's ice cream as an adulterated food.

We must accord to the State's prescription of 12% milkfat content a presumption that the statute is not "arbitrary"; that "a legitimate state interest" is involved in Iowa's desire to fix a standard for ice cream; that the 12% milkfat standard fixed is not "devoid of rational relationship", to such regulatory interest as the State can legitimately have in the quality of ice cream sold; and, in the absence of some proof to the contrary, that the standard does not have the effect of being unduly "discriminatory or burdensome" upon the selling of ice cream in commerce.

These presumptions must be indulged in, unless they are incapable of existing on the face of the statute, or are left without basis from persuasive legislative history, or are shown to be contrary to fact by extraneous probative demonstration. None of these dissipating aspects can legally be declared to be present and controlling as the case stands here.

The Hutchinson Ice Cream Co. case, supra, 147 N.W. 195, declared that the Iowa legislative purpose in fixing a minimum milkfat standard for ice cream was "to prevent * * * such deception and fraud as would be possible without a standard", and that "it cannot be seriously claimed that the statute will not accomplish the end sought" (p. 201). And the United States Supreme Court, in

affirming the case, 242 U.S. 153, 37 S.Ct. 28 as noted above, recognized the right of the State to prescribe a minimum milkfat standard on this basis.

Neither before the Iowa Supreme Court nor before the United States Supreme Court, however, was the question involved or discussed of whether the fixing of such a high milkfat standard could in itself be unreasonable, as going beyond the need and purpose of simply having some minimum standard exist to prevent fraud and deception, when related to the effect which the 12% prescription would have to preclude the sale of ice cream of a lesser fat content, concededly not constituting an unwholesome food, and representing one for which there might be shown to be a substantial consumer demand.

I should suspect that, in the weight-watching and calorie-counting fervor of our day, there could well exist, particularly among women, a stronger demand for 10%, than for 12%, milkfat ice cream. In any event, I should have no doubt that the Madison Avenue experts at least would be quick to recognize the potentiality for such a demand being created upon any general reading of the proceedings and findings underlying the promulgation of the federal 10% standard.

Testimony in the federal hearings by a witness from the Food and Nutrition Board of the National Research Council, which was relied on by the Commissioner of Food and Drugs, showed "that certain nutritive ingredients of ice cream are of great importance to the nutrition status of the population of the United States" but "that an ice cream consisting of 10 percent milk fat and 20 percent total milk solids would better supply these essential ingredients than an ice cream consisting of 12 percent milk fat and 20 percent total milk solids". 25 Fed.Reg. 7132, Finding 45. In other words, an ice cream of 10% milkfat and 20% milk solids constitutes one of "optimum nutri-

---

2. The quoted expressions are from Florida Lime and Avocado Growers, Inc., v.

Paul, 373 U.S. 132, 152 and 154, 83 S. Ct. 1210, 1222 and 1223, 10 L.Ed.2d 248.

tive value" (ibid.) from a health standpoint, and the extra 2% in a 12% product ordinarily is merely serving to add fat or weight to the body.

But in the present situation this dietary fact or expert opinion is not evidentially before us, and it is not a matter of which we can take judicial notice as against the legally presumed existence of a valid basis for Iowa's 12% standard. Without legislative history or probative demonstration to indicate that the State's selection of a 12% standard over a 10% one was wholly artificial and could not have had any public-interest basis, we must presume that it did have some possible health object and relationship as to the people of the State.

On the street, I might be privileged to rationalize that an Iowa rural legislature, in fixing the high 12% milkfat standard, was simply acting to make the ice cream business an instrument for the creation of a greater local milk market. On the bench, however, so far as anything probatively is before us, I am constrained to presume, as I have indicated, that the legislature was acting in appropriate food and health interest of the people of the State and not wholly artificially or arbitrarily. I must accept the possibility that an Iowa legislature, acting in the year 1911, could have believed, and had some basis for doing so, that because of the State's climate, the physical condition of its people, the character of the work and activity in which they were engaged, or some other local reason of well-being, there was a need to require the public to eat 2% more butter fat in their ice cream or to have them put on more weight.

Of course, notwithstanding this presumption of legitimate state regulatory interest, the 12% milkfat requirement might still be found to be federally invalid if it could be shown that it operated to preclude the selling of any ice cream in interstate commerce in Iowa so as to close the doors of commerce to this field in the State. But this does not mean that by virtue of the federal regulation Borden must be accorded an absolute right to sell 10% ice cream in commerce. The federal 10% milkfat standard is merely a minimum one and not a preemptive one for purposes of commerce. 25 Fed.Reg. 7132.

Iowa, as I have stated, has a right to require a higher quality-standard for ice cream sold in that State, if there is a legitimate basis of local food or health consideration for its doing so. And manufacturers in commerce could in this situation be made to comply with that standard, unless it was so impossible economically for them to do so that they would in effect be excluded from having any ice cream market in the State. Ten percent ice cream is not a product against which Iowa, on an inherent basis, such as food unwholesomeness, can cut off all market in the State as to commerce. Any other bases of food and health consideration which Iowa might have would in their local significance be entitled to be weighed against their commerce effect for purposes of respective federal and state interest. Of course, as previously stated, in whatever right there thus might be to have an ice cream market within the State in commerce, there necessarily would exist the right, by virtue of the federal regulation, to sell the 10% milkfat product under the name of ice cream.

But there is no need to engage in further discussion of this aspect, because Borden has not proved that it would in practical effect be excluded from any sales market in commerce for ice cream within Iowa unless it is permitted to sell its 10% milkfat product. The showing of the stipulation, that it will cost Borden $364,000 more per year to comply with Iowa's 12% milkfat standard as to the 3,200,000 gallons of 10% milkfat ice cream which it now sells there, is not a sufficient basis for a finding that the door to interstate commerce in the sale of ice cream would for all practical purposes be closed to it in Iowa by the enforcement of the State's 12% standard. I do not know from these facts alone that Borden cannot in economic reality, and in general representativeness of the situation of the

industry, engage in selling 12% ice cream as to the Iowa market, if it is not permitted to sell its 10% product. Indeed, Borden does not assert that it intends to withdraw from the Iowa ice cream market if it does not win its law suit here. As a matter of fact, the stipulation shows that prior to the promulgation of the federal regulation in 1960, and until 1961, Borden had complied with the Iowa 12% standard in its sale of ice cream in commerce within that State, and presumably it had been economically possible for it to do so.

There might be another way in which Iowa's prohibition of the sale of 10% milkfat ice cream could possibly constitute an improper burden on interstate commerce. This would perhaps be the case, even though it were economically possible to comply with the 12% standard, if the fact was that there was a significant public demand in Iowa for a 10% milkfat ice cream, which was not being allowed to be satisfied through commerce on some merely slight basis of state interest. The slight basis of state interest might in such a situation have to yield for subordinacy to the federal interest of having as full a general flow of commerce as possible.

I do not undertake to say that such a situation would command a holding that there existed an improper blocking or burdening of interstate commerce. Borden's figure of 3,200,000 gallons of 10% milkfat ice cream having been sold by it does not of itself prove that the conditions obtain to which I have referred. There is nothing to indicate that this is intrinsically a demand for 10% ice cream as such, and that Borden's sales have more of a basis than a mere lower price over the 12% product. Iowa probably could not be compelled to yield to commerce demands on a mere lower price basis if there is any food or health ground at all for its prescription of a 12% standard. A mere demand by the public for a right to purchase a lower priced ice cream would ordinarily have to seek its outlet in the political field.

While judicially I am not without hesitancy to do so, I shall, on due deliberation, take the liberty of adding a few extraneous practical observations. It is obvious I think, that the situation which is here involved is one of considerable commercial interest and significance. It is also a matter which I am sure will become one of greater consumer interest and pressure than has hitherto manifested itself, in part at least, because of the present-day fashionableness of calorie and diet concern. Further, I should guess that legal attack upon the Iowa 12% milkfat standard is not likely to cease with the disposition made here of Borden's suit. Nor should I want our present disposition to be regarded as carrying any implication that a subsequent litigant may not be able to demonstrate with compelling probativeness that the Iowa statute is, on modern realities, without sufficient food and health relation to entitle it to embargo 10%-ice-cream commerce.

In short, with all deference, I wonder if the time has not about come for Iowa to take a modern look at its 54-year-old ice cream statute and to engage in a fresh legislative consideration of the desirability of according to its people the privilege of buying federal-standard ice cream. This would correlate its enforcement problems to those of the federal field and certainly thereby tend to ease the burdens of the State Secretary of Agriculture. It would conform to the policy which the State later saw fit to adopt as to foods generally by the provisions of § 190.2. And it would bring the privilege of the people of Iowa as to ice cream into line with what has been the trend in the other states. All of this I recognize is, of course "none of my (judicial) business".

Summarizing the effect of my legal expression, I am of the view (1) that Iowa's labeling statute cannot be enforced against Borden's use of the name "ice cream" for its 10% milkfat product; (2) that there is no necessity, however, to issue an injunction against the Secretary of Agriculture in this respect, be-

cause I can see no basis to believe that he would undertake to engage in any enforcement against the determination and declaration here made; (3) that Borden has not demonstrated its right to have enforcement of the Iowa adulteration statute enjoined against the sale of its 10% milkfat product; and (4) that the requests of the complaint for an injunction should accordingly be dismissed.

McMANUS, District Judge.

I concur with the view (1) that Iowa's labeling statute cannot be enforced against Borden's use of the name "ice cream" for its 10% milkfat product; and (2) that under the present state of the record, Borden has not demonstrated its right to have enforcement of the Iowa adulteration statute enjoined against the sale of its 10% milkfat product.

However, I would not dismiss but would, in the interest of justice and avoidance of multiplicity of actions, reopen the case to permit the parties to introduce evidence on the question of whether Iowa's 2% requirement in excess of the federal has a legitimate constitutional purpose.